IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JESSICA HOGAN, et al., : | |
| : | |
| Plaintiffs, : | |
| : | Case No. 2:15-CV-2883 |
| v. : | |
| : | JUDGE ALGENON L. MARBLEY |
| CLEVELAND AVE RESTAURANT INC. : | |
| d/b/a SIRENS, et al., : | Magistrate Judge Deavers |
| : | |
| Defendants. : | |

## **OPINION & ORDER**

### I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Approval of Class Action Settlement (ECF No. 223), Defendant's Separate Motion for Preliminary Approval of Class Action Settlement (ECF No. 228), a Joint Motion for Leave to File Under Seal Class Member Claim Distribution Protocol (ECF No. 224), and Plaintiff's Unopposed Motion to File the Parties' Joint Proposed Claim Form for Entertainer Subclass Members (ECF No. 225). For the reasons stated below, the Court **GRANTS** all four motions.

### II. BACKGROUND

The Court incorporates the relevant background facts and settlement terms set forth in Plaintiff's Motion, which read as follows[1]:

    **2. Background of the Lawsuit and Claims**

        **2.2. The Parties**
        Sirens is a Columbus-area strip club. Plaintiffs allege that the individual

---
[1] Defendants have filed their own separate motion for approval to note significant discrepancies in the underlying facts of the case. (ECF No. 228). The Court takes note of Defendant's motion but declines to decide the facts.

1

defendants (Chad Sullivan, Francis Sharrak, Michael Sharrak, Dominick Alkammo, and Jay Nelson) are Sirens' owners, managers, or other individual "employers," as defined by wage and hour laws. Jessica Hogan is a former Sirens bartender. She also occasionally worked there as an exotic dancer. Ms. Hogan worked at Sirens from approximately August 2013 until June 10, 2015. DeJha Valentine is a former Sirens exotic dancer. She worked at Sirens from approximately October 2015 until the summer of 2017.

### 2.3. The Claims at Issue

Plaintiffs bring claims on behalf of two subclasses of Sirens' workers—bartenders and entertainers. Each subclass has separate claims.

#### 2.3.1. Bartender Claims

Plaintiff Jessica Hogan brings several claims on behalf of herself and similarly situated bartenders. First, she alleges that Sirens overcharged the bartenders to process credit card tips. Specifically, Hogan alleges that Sirens paid approximately a fee of 2–5% to process credit card tips, but Sirens kept 10% of all of the bartenders' credit card tips. *See* Amended Complaint, Doc. 74, ¶ 56; Amended Answer, Doc. 100, ¶ 56(a); Nelson Dep., p. 66. Second, Hogan alleges that Sirens required bartenders who performed three or more dances in a night to tip out non-tipped employees, including security guards and disc jockeys. *See* Amended Complaint, Doc. 74, ¶ 56. Third, Hogan alleges that Sirens required bartenders to use their tips to pay Sirens for any drawer shortages or overages. *See* Amended Complaint, Doc. 74, ¶ 56. Fourth, Hogan alleges that Sirens required bartenders to purchase uniforms and outfits to work at the club, *id.*, and that because Sirens paid the bartenders tipped minimum wage, these purchases necessarily dropped the bartenders' wages below minimum wage. *See* 29 C.F.R. 531.35. Fifth, Hogan alleges that Sirens required bartenders to attend mandatory, unpaid company meetings. *See* Amended Complaint, Doc. 74, ¶ 56.

Plaintiffs contend that the first three pay policies violate the FLSA's "tip credit" requirements, *see* 29 U.S.C. 203(m), and that if Hogan proved any one of these violations, she and her fellow bartenders would be entitled to the difference between full minimum wage and the tipped minimum wage that Sirens paid. If Hogan proved that Sirens unlawfully required her and other bartenders to purchase uniforms, Sirens could be liable for the cost of the uniforms. Finally, if Hogan proved that Sirens required employees to work off-the-clock by attending mandatory, unpaid company meetings, Sirens would be liable for those unpaid wages. Both the FLSA and Ohio law allow prevailing workers to also recover additional damages and attorney's fees.

### 2.3.2. Entertainer Wage Claims

Both Plaintiffs bring straightforward claims on behalf of Sirens' entertainers. Instead of the club paying the entertainers to work there, it is undisputed that the club charged entertainers various fees and "rent" to work at Sirens.[2] Like many clubs in Ohio, Sirens enshrined this practice in a document called a "lease agreement" and referred to the practice as the "tenant system" or the "entertainer tenant system."

Although the lease agreement outlines Sirens' pay practices, it is the practices, not the agreement itself, that give rise to Plaintiffs' claims. In other words, Plaintiffs contend it does not matter whether someone signed the agreement. What matters, they contend, is that a woman worked for Sirens and was not paid for her work—a policy Sirens concedes that it applied to all entertainers. *See, e.g.*, Sirens 30(b)(6) dep., pp. 58, 60–62, 69–70. Sirens also applied these practices to employees who occasionally danced, like Plaintiff Jessica Hogan. *Id.*, at pp. 116–120.

Like other clubs that employ this practice, Sirens' defense is that the entertainers are "tenants," not employees. Plaintiffs counter that, nearly without exception, "courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013). If Plaintiffs proved that Sirens' practices violated the law, the entertainers would be entitled to full minimum wage for every hour they worked, plus additional FLSA and Ohio law damages, attorney's fees, and costs.

### 2.3.3. Entertainer Spoliation and Sanctions Claims

A subclass of entertainers also raised spoliation claims against Sirens. Plaintiffs raised those claims in two contexts, sanctions and the Ohio tort of spoliation. The Court already granted Plaintiffs' sanctions request, *see* Doc. 165, which the Sirens Defendants moved to reconsider. The spoliation claim would be left for trial or summary judgment, absent the settlement. Although no specific monetary allocation is made for these claims, they will be released by this settlement.

. . . .

### 2.4 Summary of Settlement Terms

This settlement encompasses both monetary and non-monetary relief for the entertainer subclass. Defendants purport to have fixed their pay practices with respect to the bartenders, so the Agreement provides the bartenders with only monetary relief.

### 2.4.1 Monetary Terms

Sirens has agreed to pay a total of $600,000 to settle Plaintiffs' claims. *See* Agreement § 3. This amount is inclusive of fees, service awards, and most costs. *Id.* Note that the discussion below on the money allocated to bartenders and dancers is prior to the deductions for fees, expenses, and service awards. Before delving into how the money is divided and distributed under the Settlement Agreement, it is necessary to address the amount of the settlement fund. Plaintiffs contend that Sirens paid the vast majority of its workers nothing for the relevant time frame, about 6.5 years. Payroll records for entertainers do not exist, thus, Plaintiffs are left to guess at the potential damages. Still, Plaintiffs contend this might provide a reasonable estimate:

20 entertainers at any one time × 20 hours worked per week per entertainer × 52 weeks per year × 6.5 years × approximate minimum wage of $8.20 = $1,108,640 in unpaid wages

The damages do not stop there, however, because Ohio wage law (Art. II, Sec. 34a) and the FLSA impose additional multipliers on unpaid wages. If combined, Plaintiffs contend that those multipliers would add another $3,325,920 in liquidated/additional damages and that Ohio's Prompt Pay Act could add even more ($200 per person per pay period). Plaintiffs' antitrust claims also include damages multipliers. None of this accounts for the fees and rent Plaintiffs and the Entertainer Subclass members paid to Defendants, which would act as a negative wage and, thus, would also be recoverable (with FLSA/Ohio multipliers), in Plaintiffs' view, if this case were to go forward. The ultimate result, Plaintiffs contend, is a potential judgment of around $10,000,000.

A judgment of this magnitude is insurmountable for a single strip club with no insurance coverage for these claims. Thus, the settlement is not based on the case's merits but simply on a reasonable appraisal of what Sirens has the capacity to pay. To determine what Sirens could pay, Plaintiffs employed a third-party forensic accounting firm, GBQ Consulting, LLC. Rebekah Smith, who led GBQ's team on this case, provided a list of items she needed to evaluate Sirens' financial position. Sirens produced the requested items. Smith and her team thoroughly reviewed those items and, with Sirens' permission, entered Sirens' business to observe operations. Her evaluation informed the subsequent settlement negotiations. In light of the information she provided, Plaintiffs' counsel believe this settlement is fair and reasonable.

### 2.4.2. Bartender Monetary Settlement

From the $600,000, Defendants will pay bartenders who file claims 1.5 times their unpaid wages calculated as the difference between full minimum wage and the tipped minimum wage. The claims period (and hence the release) would be limited to October 6, 2012 to December 3, 2015, the date Defendants

claim to have ceased keeping 10% of the bartenders' tip money.

If every eligible bartender filed a claim, they would be owed approximately $60,000 in unpaid wages, or $90,000 under the settlement. There are approximately 15 eligible bartenders whose claims are at issue. Unlike the situation with entertainers, Defendants kept records of the bartenders' wages and hours, so calculating the amounts due is a straightforward exercise.

### 2.4.3. Entertainer Monetary Settlement

After any bartenders who file claims are paid, the remainder of the $600,000 fund (again after fees, costs, etc.) will be divided among all entertainers who file claims based on the amount of weeks each worked.

As the Court is aware, Defendants' recordkeeping with respect to entertainers poses a problem when it comes to identifying, notifying, and paying these class members. Accordingly, the parties have agreed on a number of provisions aimed at remedying this issue. First, the parties have agreed on a robust notice process consisting of the following:
- Plaintiffs will transmit by regular mail and email a class notice and claim form to any entertainer for which Defendants have contact information.
- Plaintiffs will establish a website that will include a copy of the Notice and Claim Form. Entertainers will be able to complete the claim form by electronic signature. Class Counsel may also post links to that website on their own webpages and social media pages.
- Plaintiffs will create a Facebook page with links to the Notice and Claim Form. Plaintiffs will "promote" either the page itself or a relevant post on the page to individuals in Ohio who have expressed an interest in Sirens.
- Entertainers can submit claims for up to one year.

Second, the parties have agreed to a two-step process for verifying entertainers' claims.

This is described in the Agreement and a motion to be filed under seal.

Third, every entertainer who files a qualifying claim will receive a "submission payment" of $85.00 (which also is the minimum payment level for all entertainers). This payment is an advance on any other award they could receive. The purpose of the payment is to encourage class participation and transfer money into the entertainers' hands as quickly as possible.

### 2.4.4. Non-Monetary Terms

In addition to the monetary relief described above, the Settlement Agreement affords entertainers substantial non-monetary relief.

First, within 14 days of the Court's *preliminary* approval of the Agreement, Defendants will begin to allow entertainers to choose whether to be

employees or independent contractors. Agreement § 9(A), (B). If an entertainer chooses to be an employee, then Defendants will comply with all wage and hour laws with respect to that person. *Id.* Although the Agreement allows Defendants to give entertainers a choice, the Agreement does not shield Defendants from future claims; Defendants still would be legally responsible if they misclassify an entertainer as a non- employee. Agreement § 9(D).

Second, if any of the Class Counsel is granted an injunction against any other Ohio strip club regarding the "entertainer tenant system," or obtains comparable, non-monetary relief via a settlement, then Defendants will be required to comply with the terms of that injunction or settlement within 24 months.[3] Agreement § 9(C). The purpose for the delay is to give Defendants a benefit for settling now and to keep them from incurring a competitive disadvantage relative to Defendants' non-settling industry peers.

Third, if Defendants Sullivan or Alkammo become owners of a club, they are restricted from engaging in various activities like using an entertainer tenant system, blacklisting entertainers, or colluding with clubs to classify entertainers as non-employees. Agreement § 9(E). This restriction lasts for a year. *Id.*

### III. LAW & ANALYSIS

### A. Motion for Preliminary Approval of Class Action Settlement (ECF No. 223; No. 228)

A Court reviewing settlements for approval first determines whether a settlement is reasonable before approving the settlement preliminarily, then requires notice to be sent to interested persons, and finally decides whether to finalize approval after a hearing has been conducted. *See Swigart v. Fifth Third Bank*, 1:11-CV-88, 2014 WL 3447947, at *2 (S.D. Ohio July 11, 2014).

As a general rule, "[t]he FLSA's provisions are mandatory and, except as otherwise provided by statute, are . . . not subject to being waived, bargained, or modified by contract or by settlement." *Kritzer v. Safelite Solutions, LLC*, 2012 WL 1945144, at *5 (S.D. Ohio May 30, 2012). The Court's role in approving an FLSA settlement, and an Ohio wage and hour settlement, "is comparable to that of a court in a settlement of a class action brought pursuant to Fed. R. Civ.

P. 23." *See id.* (quoting *Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, *5 (N.D. Ohio Mar. 8, 2010)). The Court must ensure that there is a bona fide dispute between the parties and that the settlement is a product of arms-length negotiation that was fair, reasonable, and adequate. *See Kritzer,* at *5-6.

1. Whether there was a Bona Fide Dispute Between the Parties

The requirement that there be a bona fide dispute between the parties stems from the need to ensure the parties are not negotiating around the FLSA's requirements concerning wages and overtime. *Id.* at *5. The central issue in this case is whether Defendants adequately paid their employees—both bartenders and exotic dancers. Defendants continue to claim that their process of classifying dancers as "entertainer tenants" is valid and that those dancers are not employees under the FLSA. (ECF No. 228 at 2-3). Plaintiffs believe that they have a "high probability of success" on their claims that Defendants failed to pay minimum wage and overtime to both the bartenders and the entertainer classes. (ECF No. 223 at 4-5, 13). Given this dispute, the Court is satisfied that the Proposed Settlement Agreement is not an attempt to negotiate around the FLSA's mandatory requirements of compensating employees for unpaid wages.

2. Whether Negotiations were Fair, Reasonable, and Adequate

In determining whether a proposed FLSA settlement is fair, reasonable, and adequate, a district court is required to consider and balance several factors: (a) Plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement; (b) the complexity, expense, and likely duration of the litigation; (c) the stage of the proceedings and the amount of discovery completed; (d) the judgment of experienced trial counsel; (e) the nature of the negotiations; (f) the objections, if any, raised by the class members; and (g) the public

interest. *Kritzer,* at *6. Here, the Court finds that the balance of factors weighs in favor of approving the Proposed Settlement Agreement.

### a. Likelihood of Success

The most important factor the Court must consider in approving an FLSA settlement "is [Plaintiff's] probability of success on the merits, particularly when weighed against the recovery provided in the proposed settlement agreement." *Id.* The lower the likelihood of success, the more desirable a settlement. *Id.* Here, Plaintiffs maintain that they believe they have a high likelihood of success on the merits. (ECF No. 223 at 14). Plaintiffs, however, express concern about the ability to collect from Defendants given the Defendant's failure to keep adequate records. *Id.* Weighing the risks inherent in litigating such claims against the monetary and non-monetary relief provided for in this settlement, this Court determines that this factor weighs in favor of approval.

### b. Complexity and Expense of Litigation

The second factor the Court must consider is the complexity and expense of potential litigation. Plaintiffs state that this case, like most wage and hour collective and class actions, is inherently complex. *Id*. at 15. Unlike most other cases, Plaintiffs claim, this case is "arguably more complex" because of "Defendants' record keeping issues." *Id.* Plaintiffs add that this case has been and, in the absence of settlement, would likely continue to be hotly contested. *Id.* The proposed settlement agreement eliminates the burden on the parties of preparing and proceeding with trial, and therefore, weighs in favor of approval.

### c. Stage of Proceedings

The next factor is intended to ensure Plaintiffs have had access to the information needed to adequately assess the case and the desirability of the settlement agreement. *See Kritzer,* at *7. This case has been pending for nearly four years and the parties have had opportunity to review

the substantial amount of information exchanged in discovery. This factor weighs in favor or approval.

### d. Judgment of Experienced Counsel

By agreeing to this settlement, both Plaintiffs' and Defendants' counsel have indicated their shared belief that the Agreement is fair, reasonable, and adequate. The Court accords weight to the belief of experienced counsel. *See Castillo v. Morales, Inc.*, No. 2:12-cv-650, 2015 WL 13021899, at *5 (S.D. Ohio Dec. 22, 2015).

### e. Nature of Negotiations

Before approving an FLSA settlement, the Court must be convinced that the parties proposed settlement agreement "is non-collusive and the product of arms-length negotiations." *See id. at *4-5*. Here, the parties represent that they reached the settlement after attending three separate mediations with Magistrate Judge Jolson, who also supervised the finalization of the settlement agreement. (ECF No. 223 at 15-16). Given these representations and the involvement of the Court in mediating a settlement, the Court concludes that the Proposed Settlement Agreement is a product of arms-length negotiations.

### f. Objections by Class Members

In evaluating an FLSA settlement agreement, the Court is required to consider the objections, if any, raised by class members. This factor will be evaluated at the final approval stage.

### g. Public Interest

The final factor the Court must consider is whether the public interest would be served by settlement. Because the parties' proposed settlement agreement would end long and protracted litigation, the Court finds that this factor weighs in favor of approval. *See Kritzer*, 2012 WL

1945144, at *8 (noting "the public interest in favoring settlement certainly applies here, as the proposed settlement ends potentially long and protracted litigation.").

In sum, the balance of the seven fairness factors weigh in favor of approving the parties' proposed settlement agreement. Accordingly, the Court will certify two settlement classes/collectives:

> **Bartenders**: All bartenders who worked for Defendants from October 6, 2012 to December 3, 2015.
>
> **Entertainers**: All dancers who worked for Defendants from October 6, 2012 to February 21, 2019, and who were not paid at least minimum wage for all hours worked.

These classes are defined pursuant to the terms articulated in Plaintiff's Motion. (ECF No. 223 at 16-17).

### 3. Whether the Attorneys' Fees Award is Reasonable

The Sixth Circuit has held that an award of attorneys' fees must be reasonable, meaning it must be "one that is adequate to attract competent counsel, but . . . [does] not produce windfalls to attorneys." *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999). Courts within this circuit have found that a fee representing one-third of the total settlement amount is reasonable. *See, e.g.*, *Farkas v. Boschert*, 2018 WL 3100905, *2 (E.D. Mich. June 25, 2018) ("The Court also finds that Plaintiff's counsel fee, representing one-third of the total settlement amount, is reasonable for the work performed and the result obtained."). The Sixth Circuit has also approved of the lodestar method where the fee award requested is considered "reasonable when it amounts to double the loadstar attorneys' fees incurred by the plaintiffs' counsel." *Osman v. Grube, Inc.*, 3:16-CV-00802-JJH, 2018 WL 2095172, at *3 (N.D. Ohio May 4, 2018)

Here, the parties' Proposed Settlement Agreement would award Plaintiff's counsel $200,000 in attorneys' fees, amounting to one-third of the total settlement amount as well as litigation expenses. The Court will make a final determination as to this award at the final approval stage. Plaintiffs' counsel is directed to submit a tally of all hours spent on this matter as well as the total for litigation expenses at that time.

4. Incentive Payments to Named Plaintiffs

Plaintiffs propose incentive awards of $15,000 to Ms. Hogan and $10,000 to Ms. Valentine. (ECF No. 223 at 18). Courts recognize and grant "incentive awards [as] efficacious ways of encouraging member of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Osman v. Grube, Inc.*, 3:16-CV-00802-JJH, 2018 WL 2095172, at *2 (N.D. Ohio May 4, 2018) (citing *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir. 2003). Plaintiffs argue that such awards are warranted because they are in line with amounts awarded in similar cases, the awards take into account the named Plaintiffs' time and effort in participating in the case, and because Plaintiffs will forgo the $5,000 fine the Court previously levied against Defendants. (ECF No. 223 at 18). The Court finds that these awards are appropriate in light of the factors listed by Plaintiff.

5. Proposed Notice, Fairness Hearings

The proposed notices are hereby approved. The Court will conduct two fairness hearings for approval of the entertainer and bartender classes. The first fairness hearing for the bartender class shall take place on **July 16, 2020 at 9:00 AM**. The second fairness hearing for the entertainer class shall take place on **January 27, 2021 at 9:00 AM**.

### B. Joint Motion for Leave to File Under Seal Class Member Claim Distribution Protocol (ECF No. 224)

The parties have also jointly moved for leave to file under seal a class member claim distribution protocol. Although the Sixth Circuit has not yet weighed in on this issue, this Court and the majority of trial courts in this Circuit have held that there is a strong presumption in favor of public access to settlement agreements in FLSA collective action cases. *See Zego v. Meridian-Henderson*, No. 2:15-CV-3098, 2016 WL 4449648, at *1 (S.D. Ohio Aug. 24, 2016). Absent an "extraordinary reason," settlement agreements should not be sealed. *Schmalenberg v. Dysphagia Mgmt. Sys., LLC*, No. 1:18-CV-99, 2019 WL 978472, at *2 (S.D. Ohio Feb. 28, 2019); *Joo v. Kitchen Table, Inc.*, 763 F. Supp. 2d 643, 646-47 (S.D.N.Y. 2011) (collecting cases). Trial courts determine whether a settlement may be kept confidential by balancing the parties' interests in confidentiality against this strong presumption. *See, e.g.*, *Snook v. Valley OB-GYN Clinic, P.C.*, No. 14-cv-12302, 2014 WL 7369904, at *3 (E.D. Mich. Dec. 29, 2014).

Here, the parties argue that it is necessary to file the distribution protocol under seal to avoid the possibility that false claims and incorrect and unfair distributions are made. (ECF No. 224 at 2). The parties have narrowly tailored their request to file under seal to only the distribution protocol. Since the parties have demonstrated a need to ensure that the settlement funds are fairly allocated, the Court finds that the public's interest in disclosure of the distribution protocol is outweighed by the need to ensure the settlement fund is properly distributed. The parties may submit this protocol under seal.

### C. Plaintiff's Unopposed Motion to File the Parties' Joint Proposed Claim Form for Entertainer Subclass Members (ECF No. 225)

Plaintiffs have also submitted to the Court for approval the parties' proposed claim form for the entertainer subclass. (ECF No. 225). This proposed claim form is approved.

### IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Plaintiff's Motion for Preliminary Approval of Class Action Settlement (ECF No. 223) and Defendant's Separate Motion for Preliminary Approval of Class Action (ECF No. 228). The first fairness hearing is set for **July 16, 2020 at 9:00 AM**. The second fairness hearing is set for **January 27, 2021 at 9:00 AM**. The Court also **GRANTS** the parties' Joint Motion for Leave to File Under Seal Class Member Claim Distribution Protocol (ECF No. 224) and Plaintiff's Unopposed Motion to File the Parties' Joint Proposed Claim Form for Entertainer Subclass Members (ECF No. 225).

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: December 10, 2019**