IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Jessica Hogan, *et al.*, | |
| *On behalf of themselves and those similarly situated*, | Civil Action No. 2:15-cv-2883 |
| Plaintiffs, | Judge Marbley |
| v. | Magistrate Judge Deavers |
| Cleveland Ave. Restaurant, Inc., *et al.*, | |
| Defendants. | |

## PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY THIS AS A COLLECTIVE ACTION, TO CERTIFY THIS AS A RULE 23 CLASS ACTION, AND TO SEND NOTICE OF THIS ACTION TO ALL SIMILARLY SITUATED EMPLOYEES

Pursuant to 29 U.S.C. § 216(b) and Article II, Section 34a of the Ohio Constitution, plaintiffs hereby move for an order conditionally certifying this as a collective action and authorizing them to send to the following similarly situated employees notice of the claims asserted against defendant Buckeye Association of Club Executives ("BACE"), defendant Greg Flaig, defendant The Owners Coalition ("OC"), the Cheeks defendants, the Private Dancer defendants, the House of Babes defendants, the Top Hat defendants, the Fantasyland West defendants, and the Centerfold defendants in the Second Amended and Supplemented Class and Collective Action Complaint ("Second Amended Complaint"):

1

All non-owner, non-employer exotic dancers who worked at any of defendants' strip clubs at any time from May 14, 2014 to the present

(1) while such club

    (a) has used the Entertainer Tenant System created and disseminated by Defendant Greg Flaig,

    *or*

    (b) has required its dancers to sign and abide by the Entertainer Tenant Space Lease Agreement created and disseminated by Defendant Greg Flaig,

    *or*

    (c) has otherwise formally regarded its dancers as leasing space at such club as entertainers and required them to acknowledge the same,

    *and*

(2) while such club did not pay any wages to its dancers.

Plaintiffs further ask the Court to certify this as a class action under Rule 23 of the Federal Rules of Civil Procedure and Article II, Section 34a of the Ohio Constitution, with a class consisting of the same class members.

In addition, plaintiffs request that defendants be ordered not to retaliate against any dancer for opting into or otherwise participating in this action and, to facilitate this non-retaliation, that opt-ins be filed under seal.

The grounds for this Motion are set forth below in the Memorandum in Support. As stated in the Memorandum in Support, all similarly situated employees should be notified of this action and of their right to participate in it.

2

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................................1

**<u>Summary</u>**: Plaintiffs are suing six strip clubs, their owners and managers, two strip club trade associations, and Greg Flaig. Flaig is the architect of the "Entertainer Tenant System" adopted by the six strip clubs and the creator of the "Entertainer Tenant Space Lease Agreement" used by them. Plaintiffs sue on behalf of all dancers who have worked at a club under Flaig's "Entertainer Tenant System," who have been subject to his "Entertainer Tenant Space Lease Agreement," or whose club otherwise regarded them as tenants leasing space at the club as entertainers. As a consequence of using Flaig's Tenant System, his Lease Agreement, and/or treating their dancers as tenants leasing space, these clubs have not paid any wages to their dancers and in fact have exacted from them unlawful fees, including "rent," for the privilege of dancing at their clubs. Employees are entitled to protections under the Fair Labor Standards Act and analogous state wage and hour laws, including Article II, Section 34a of the Ohio Constitution, as well as Ohio's Prompt Pay Act, R.C. § 4113.15. This case satisfies both the "similarly situated" standard for "conditional certification" under the FLSA and Rule 23's requirements for class certification. The standard at the conditional-certification stage prior to notice is fairly lenient and typically results in "conditional certification" of a representative class. At this stage, a court does not generally consider the merits of the claims, resolve factual disputes, or evaluate credibility. If conditional certification is granted, "plaintiffs are permitted to solicit opt-in notices, under court supervision, from current and former employees." Plaintiffs have identified a pay practice that was devised and propagated by Flaig as a uniform scheme for Ohio strip clubs, that was promoted by Flaig and the two strip club trade associations, that is common to every defendant club named in this case, and that applies to every dancer at each of those clubs, a pay practice to which plaintiffs themselves also were personally subject as dancers. Courts routinely have found this type of widespread misclassification to be appropriate for FLSA conditional certification. The FLSA claims in this case fit the pattern established in other "exotic dancer" cases and likewise should be conditionally certified. Due to the pervasive scheme involving all of the defendants, plaintiffs and the class of dancers they seek to represent have been subjected, and will continue to be subjected as members of the dancer community, to the same unlawful pay practices and policies. Plaintiffs thus are similarly situated to their fellow dancers and, accordingly, conditional certification is appropriate under the FLSA. Because the Tenant System and the Lease Agreement comprise the predominate pay practice and unifying thread linking all of the

defendants and all of the members of the putative class, certification under Rule 23 also is appropriate. This case satisfies the requirements of Rule 23(a) and should be certified under Rule 23(b)(3), 23(b)(2), and 23(b)(1)(A). The Court should authorize issuance of plaintiffs' proposed notice.

**Primary Authorities**: 29 U.S.C. § 216(b); Article II, Section 34a of the Ohio Constitution; R.C. § 4113.15(A); *Craig v. Bridges Bros. Trucking LLC*, 823 F. 3d 382 (6th Cir. 2016); *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544 (6th Cir. 2006); *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759 (N.D. Ohio 2015); *Swigart v. Fifth Third Bank*, 276 F.R.D. 210 (S.D. Ohio 2011); *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919 (S.D. Ohio, Nov. 2, 2015); *Hart v. Rick's Cabaret Intern., Inc.*, No. 09 Civ. 3043(JGK), 2010 WL 5297221, *7 (S.D.N.Y., Dec. 20, 2010); *Woods v. Club Cabaret, Inc.*, 140 F.Supp.3d 775 (C.D. Ill. 2015).

II.  FACTUAL BACKGROUND OF THE CLAIMS AT ISSUE .......................................5

    A.  Overview ...............................................................................................5

    B.  The Parties ............................................................................................6

    C.  Defendants' Unlawful Pay Policies ......................................................12

        1.  Use of the Tenant System in Ohio and elsewhere in the United States ......13

        2.  The complicity of Flaig, OC, and BACE in the wage and antitrust violations ......................................................................17

            i.   Active encouragement of and involvement in their members' wage violations ...............................................................17

            ii.  Active encouragement of and involvement in their members' antitrust violations ..........................................................18

            iii. Efforts by BACE to conceal its member clubs' use of the Tenant System and the Lease Agreement ............................................24

        3.  The uniform legal standards applicable to the club defendants ................26

        **Primary Authority:** *Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015)

        *The permanency of the parties' relationship* .......................................27

*The degree of skill required to rendering the services* ............................................27

*The worker's investment in equipment or materials for the task* ........................27

*Opportunity for profit or loss* ..............................................................................28

*Whether the service rendered is an integral part of the employer's business* ........28

*The degree of control the employer has over the work* ...........................................29

II. LEGAL ARGUMENT ....................................................................................................33

    A. The "Similarly Situated" Standard Is Satisfied, Warranting Conditional
        Certification. .......................................................................................................36

**Primary Authorities**: *DeAngelis v. National Entertainment Group, LLC*, No. 2:17-cv-924, 2019 WL 6715974 (S.D. Ohio, Dec. 10, 2019); *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759 (N.D. Ohio 2015); *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544 (6th Cir. 2006); *Swigart v. Fifth Third Bank*, 276 F.R.D. 210 (S.D. Ohio 2011) *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919 (S.D. Ohio, Nov. 2, 2015)

    B. This Case Also Satisfies Rule 23's Requirements For Class Certification.........40

        1. The requirements of Rule 23(a) are satisfied. .................................................41

        *Numerosity* ........................................................................................................41

**Primary Authority:** *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285 (S.D. Ohio 2006)

        *Commonality* ....................................................................................................42

**Primary Authorities**: *Sweet v. Gen. Tire & Rubber Co.*, 74 F.R.D. 333 (N.D. Ohio 1976); *Bacon v. Honda of American Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004)

        *Typicality* ..........................................................................................................44

**Primary Authorities**: *Swigart v. Fifth Third Bank*, 276 F.R.D. 210 (S.D. Ohio 2011); *Laichev v. JBM, Inc.*, 269 F.R.D. 633, 640-41 (S.D. Ohio 2008).

*Adequacy* ................................................................................................................45

>   **Primary Authorities**: *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996); Article II, Section 34a of the Ohio Constitution

2.  The requirements of Rule 23(b) are satisfied. .................................................48

*Predominance under Rule 23(b)(3)* .......................................................................48

>   **Primary Authority:** *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)

*Superiority under Rule 23(b)(3)* ...........................................................................49

*Partial certification under Rule 23(b)(2)* ..............................................................50

>   **Primary Authorities**: 5 *Moore's Federal Practice* (3 Ed.1997); 7A Wright, Miller & Kane, *Federal Practice and Procedure* (2d Ed. 1986)

*Certification under Rule 23(b)(1)(A)* .....................................................................52

>   **Primary Authority**: 7A Wright, Miller & Kane, *Federal Practice and Procedure* (2d Ed. 1986)

C.  Plaintiffs' Proposed Notice and Notice Procedure Should Be Approved. .......53

**Primary Authorities**: *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 110 S. Ct. 482 (1989); Rule 23(c)(2); *Brandenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-cv-516, 2017 WL 3500411 (S.D. Ohio, Aug. 15, 2017); *Wagoner v. N.Y.N.Y., Inc.*, No. 1:14-cv-480, 2015 WL 1468526 (S.D. Ohio, Mar. 30, 2015)

III. CONCLUSION ...................................................................................................59

<center>**MEMORANDUM IN SUPPORT**</center>

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

In the course of this six-year litigation, plaintiffs have brought claims on behalf of Ohio exotic dancers against:

- Greg Flaig, the architect and purveyor of the "Entertainer Tenant System" used by Ohio strip clubs;

- Seven Ohio strip clubs that have used the "Entertainer Tenant System" (Sirens, Cheeks, House of Babes, Private Dancer, Fantasyland West, Top Hat, and Centerfold) and their owners and managers; and

- Two trade associations, BACE and OC, which have promoted the Tenant System and pressured their members to use it.

Plaintiffs separately settled their "dancer" claims against Sirens (aka Cleveland Ave Restaurant), its owners, and its managers on a collective action basis, and the Court approved that settlement. ECF 350. None of the other defendants has settled with plaintiffs. Two of the defendant clubs and their owners/managers defaulted (Top Hat and Centerfold), *see* ECF 365 & 366, while the rest have spawned ongoing discovery disputes through inaction or intransigence, have discarded or destroyed critical records requested by plaintiffs in discovery, or have done both. *See* ECF 371.

Plaintiffs and the thousands of Ohio dancers they seek to represent in this action are shackled by a payment—or, more accurately, *non*-payment—scheme that its creator Greg Flaig calls the "Entertainer Tenant System" ("the Tenant System") and the insidious, industry-wide agreement that clubs force dancers to sign, Flaig's "Entertainer Tenant Space Lease Agreement" ("the Lease Agreement"). Although this began as a case against only one

<center>1</center>

strip club in Columbus that admitted using the Tenant System and the Lease Agreement, namely Sirens, it now targets the broader Ohio strip industry's use of that system and that agreement over many years. At the core of this case is plaintiffs' assertion that, under the Tenant System, dancers in fact qualify as employees under existing law but they are not paid as employees or accorded the benefits of that status by their strip clubs. As employees, they are entitled to protections under the Fair Labor Standards Act ("FLSA") and analogous state wage and hour laws, including Article II, Section 34a of the Ohio Constitution ("Section 34a"), the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), and Ohio's Prompt Pay Act, R.C. § 4113.15.

Like any system that refuses to pay workers fair and lawful wages for their work, the Tenant System is born of greed and exploitation. This case attacks the Tenant System at its root, namely, the unlawful and unconscionable Lease Agreement, which Flaig and his entity OC devised and peddled to clubs throughout Ohio over the past decade, which Flaig, OC, and defendant BACE actively promoted over the same period as a way to hold down dancer earnings and enrich clubs adhering to the Tenant System, and which the seven defendant clubs — Sirens, Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West — and their owners and managers have used to accomplish the same purposes. Not only do plaintiffs allege that the Tenant System, the Lease Agreement, and defendants' practice of pretending dancers are leasing club space as entertainers rather than working there as employees and forcing them to acknowledge the same are all pay practices repugnant to the FLSA, Section 34a, and R.C. § 4113.15, plaintiffs further allege that

defendants' use and implementation of them and of concomitant group boycott tactics violate federal and state antitrust laws and give rise to state-law claims for unjust enrichment and civil conspiracy.

Both the FLSA and Section 34a allow workers to bring an action on behalf of similarly situated workers. *See* 29 U.S.C. 216(b) & Section 34a. This case satisfies both the "similarly situated" standard (for FLSA and Section 34a purposes) and Rule 23's requirements.

The standard at the conditional-certification stage prior to notice is "fairly lenient ... and typically results in 'conditional certification' of a representative class." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006) (internal citations omitted). At this stage, a court does not generally consider the merits of the claims, resolve factual disputes, or evaluate credibility. *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759, 764 (N.D. Ohio 2015); *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 214 (S.D. Ohio 2011). If conditional certification is granted, "plaintiffs are permitted to solicit opt-in notices, under court supervision, from current and former employees." *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *1 (S.D. Ohio, Nov. 2, 2015).

Plaintiffs have identified the Tenant System as an unlawful pay practice that was devised and propagated by Flaig as a uniform scheme for Ohio strip clubs, that was promoted by Flaig and the two strip club trade associations, OC, and BACE, that is common to every defendant club named in this case, and that applies to every dancer at each of those clubs — a pay practice to which plaintiffs themselves also were personally subject as dancers. Courts routinely have found this type of widespread misclassification to be appropriate for FLSA

3

conditional certification. *See Hart v. Rick's Cabaret Intern., Inc.*, No. 09 Civ. 3043(JGK), 2010 WL 5297221, *7 (S.D.N.Y., Dec. 20, 2010) (certified as collective and class action where plaintiffs challenged "defendants' blanket categorization" of exotic dancers as independent contractors"); *Woods v. Club Cabaret, Inc.*, 140 F.Supp.3d 775, 781 (C.D. Ill. 2015) (cataloguing conditional-certification determinations made by district courts in FLSA cases involving misclassification claims brought on behalf of exotic dancers; 25 of 27 conditionally certified).

The FLSA claims in this case fit the pattern established in other "exotic dancer" cases and likewise should be conditionally certified. It is undisputed that seven strip clubs – Cheeks in the Dayton area, Sirens, Private Dancer, Centerfold, and House of Babes in Columbus, Top Hat in Mansfield, Ohio, and Fantasyland West in Bucyrus, Ohio – have all used the uniform Tenant System devised and disseminated by Flaig and promoted by BACE and OC and that all seven clubs have either required their dancers to sign Flaig's standard Lease Agreement or have otherwise formally regarded dancers as leasing space from the club as entertainers and required them to acknowledge the same in writing. It also is undisputed that, as a consequence, these clubs have not paid any wages to their dancers. Nor can there be any reasonable dispute that, by pretending their dancers are non-employee lessees who "rent" space in order to perform at the club, all of the defendant clubs, club owners, and club managers have adhered to a formal uniform scheme that exacts unlawful payments from dancers for the privilege of dancing at their clubs. Due to the pervasive scheme involving all of the defendants, plaintiffs and the class of dancers they seek to represent have been subjected, and will continue to be subjected as members of the dancer community, to the

same unlawful pay practices and policies. Plaintiffs thus are similarly situated to their fellow dancers and, accordingly, conditional certification is appropriate under the FLSA. Because the Tenant System and the Lease Agreement comprise the predominate pay practice and unifying thread linking all of the defendants and all of the members of the putative class, certification under Rule 23 also is appropriate. *See Hart*, 2010 WL 5297221, at *5-*8. This case satisfies the requirements of Rule 23(a) and should be certified under Rule 23(b)(3), 23(b)(2), and 23(b)(1)(A). Plaintiffs further submit that the Court should authorize issuance of the proposed notice attached as Exhibit G hereto.

## II.     FACTUAL BACKGROUND OF THE CLAIMS AT ISSUE

### A.  Overview

This lawsuit has identified seven adult entertainment clubs in Ohio — Sirens, Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West — as well as the ownership and management of those clubs, which have conspired and colluded with defendants Greg Flaig, OC, and BACE to deny exotic dancers their rightful minimum wages and to require such dancers to pay the club owners artificial and illegal fees just to work at their clubs. These fees include but are not limited to a charge for "rent," a house fee that dancers are forced to pay under the complete and utter fiction that they are "leasing space" from the clubs while dancing there.

Flaig, who owns OC and is BACE's executive director, is the hub of this conspiracy and the architect of the unlawful practices and policies comprising the Tenant System, which these clubs, club owners, and club managers have utilized collusively. Central to the Tenant

System that Flaig has devised are form documents used by the defendant clubs. These form documents have evolved since 2009. Chief among them is the Lease Agreement and all of its various parts.

The defendant clubs, their owners, and their managers have adopted the Tenant System and have used the Lease Agreement to avoid paying their dancers any wages. Instead, they exact from dancers, for the privilege of working at their clubs, a house fee, generally called "rent," plus a large percentage of what the dancers earn from customers.

This case seeks to end the unlawful and collusive practices comprising the Tenant System, the use of the Lease Agreement in Ohio, and the practice of Ohio strip clubs pretending dancers are leasing club space as entertainers rather than working there as employees and forcing them to acknowledge the same. This case also seeks to restore to affected dancers both their rightful legal status and the charges illegally collected or diverted by these clubs and their co-conspirators, such as Flaig.

**B.     The Parties**

Cheeks is an adult entertainment club in West Carrollton, near Dayton, Ohio, which is owned by defendant Elbert Lee Hale ("Hale") and managed and operated by Hale and defendant Erick Cochran ("Cochran") (collectively "the Cheeks defendants"). Cochran has acknowledged that Cheeks has "250 to 300" dancers in a typical year, ECF 371-2, Exhibit S, Page ID # 3990, logically meaning that thousands have performed there over the past ten years. In employing exotic dancers, the Cheeks defendants have paid them less than

minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System.

Top Hat is an adult entertainment club in Mansfield, Ohio owned by an entity originally misidentified by the club's own Rule 30(b)(6) witness Greg Flaig as "Foursome Entertainment" but that appears to be called Threesome Entertainment in actuality. Top Hat is managed and operated by defendants Mark Potts, Jimmy Lee, and an individual calling himself Tim Bobb, which Top Hat now claims is his alias, although Flaig, as the club's Rule 30(b)(6) witness, gave that as his actual name (collectively "the Top Hat defendants"). The Top Hat defendants similarly have employed exotic dancers, have paid them less than minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System. The Top Hat defendants intentionally defaulted, and plaintiffs have moved for entry of a partial default judgment against them. ECF 365 & 370.

Private Dancer is an adult entertainment club in Columbus, Ohio, owned, managed, and operated by defendant John "Dutch" Matthews (collectively "the Private Dancer defendants"). The Private Dancer defendants similarly have employed exotic dancers, have paid them less than minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System.

Centerfold is an adult entertainment club in Columbus, Ohio owned by Nolan Enterprises and managed and operated by defendants Brenda Bonzo and Ray Algood (collectively "the Centerfold defendants"). The Centerfold defendants similarly have

employed exotic dancers, have paid them less than minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System. The Centerfold defendants intentionally defaulted, and plaintiffs have moved for entry of a partial default judgment against them. ECF 366 & 370.

House of Babes is an adult entertainment club in Columbus, Ohio that is owned and operated by James Deascentis (collectively, "the House of Babes defendants"). The House of Babes defendants similarly have employed exotic dancers, have paid them less than minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System.

Fantasyland West is an adult entertainment club in Bucyrus, Ohio that is owned, managed, and/or operated by defendant Mark Potts. Fantasyland West and Potts (collectively "the Fantasyland West defendants") similarly have employed exotic dancers, have paid them less than minimum wages, indeed no wages at all, and have charged them various artificial and illegal fees to work at the club under the artifice known as the Tenant System.

As noted above, Greg Flaig is the hub of the unlawful conspiracy. He takes credit for creating the Tenant System. In collusion, collaboration, and conspiracy with the other defendants, he has spent much of the past decade promoting, propagating, and perpetuating the Tenant System in Ohio. Flaig is the owner and executive director of OC, a for-profit entity that promotes the interests of its member, subscriber, and/or affiliated clubs. Flaig also is the

current executive director and former secretary of BACE, a not-for-profit trade association serving the interests of clubs that are members of or affiliated with it.

During the relevant time period, BACE and OC have functioned as the two main adult entertainment club industry trade associations in Ohio. In addition to his role as owner of Cheeks, defendant Hale serves and has served as BACE's president. Flaig, OC, and BACE have been and are responsible for the Tenant System, by which their member or affiliated clubs, including Sirens, Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West, at least since 2010 have purported to deny exotic dancers their rightful minimum wages and have required such dancers to pay various artificial and illegal fees to club owners to work at their clubs, including the house fee generally called "rent."

By promoting, implementing, and enforcing the use of the Tenant System in clubs throughout Ohio, OC and Flaig have acted within the interests of these clubs, club owners, and club managers, including Sirens, Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West, with respect to such clubs' employees and employment practices, have exercised authority to ban or un-ban dancers from such clubs, and have made themselves available to discuss employment issues with such employees. Accordingly, plaintiffs allege that OC and Flaig have met and still meet the definition of "employers" under the FLSA and Ohio law. Under the FLSA and Ohio law, the term "employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee; the term "employee" means any individual employed by an employer; and the term "employ" includes to suffer or permit to work. *See* 29 U.S.C. § 203(d), (e), and (g); Section

9

34a; R.C. § 4111.03. BACE and OC continue to exist as trade associations, and in that role, they engage both directly and indirectly with dancers at BACE-/OC-member and BACE-/OC-affiliated clubs. Flaig, BACE, OC, and their representatives have done so and continue to do so on behalf of and in the interests of BACE-/OC-member and BACE-/OC-affiliated clubs, in relation to the Lease Agreement and the Tenant System, which are used by such clubs and actively promoted by Flaig, BACE, OC, and their representatives. By promoting, implementing, and enforcing use of the Tenant System in clubs throughout Ohio, BACE, OC, and Flaig have acted within the interests of the co-conspirator clubs, club owners, and club managers, including Sirens, Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes and Fantasyland West, with respect to the co-conspirator clubs' dancer employees and employment practices. Accordingly, BACE, OC, and Flaig have met and still meet the definition of "employers" under the FLSA and Ohio law.

Flaig, BACE, and OC claimed that BACE and OC merged in 2015. Even apart from that claim, which Flaig now disavows as false, Flaig, BACE, and OC have claimed that Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West are members of, affiliated with, or subscribers of BACE and/or OC.

Under the guise of serving as "human resources consultant" to Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West, Flaig has enmeshed them in the conspiracy to deny dancers their rightful wages and to exact illegal fees from dancers in violation of federal and Ohio law. Under the same guise, Flaig has audited and monitored

these clubs on a regular basis to ensure that each of them embraces and adheres to the Tenant System.

From approximately August 2013 to June 10, 2015, plaintiff Jessica Hogan worked for Sirens primarily as a bartender. *See* ECF 100 at ¶¶ 29–30. She also worked as an exotic dancer at times. *See* ECF 194-3 (Hogan Decl.), ¶ 11. Sometimes this was during a bartending shift, and sometimes Ms. Hogan came in specifically to work a shift exclusively as a dancer. *Id.* at ¶¶ 11 & 12. When she worked as a dancer, despite not having signed an actual Lease Agreement, Ms. Hogan was subject to the same pay practices and degree of club control as the other dancers. *Id.* at ¶¶ 15 & 16.

Plaintiff DeJha Valentine worked for Sirens as an exotic dancer from approximately October 2015 until around the first half of the summer of 2017, during which she was forced to pay "rent" and other fees and was subjected to the same club control as the other exotic dancers. *See* ECF 195-4 (Valentine Decl.), ¶¶ 3, 4 & 5; *see also* ECF 195-1 (Valentine's "Lease Agreement"). The House of Babes defendants periodically have employed Ms. Valentine as a dancer at House of Babes, beginning in approximately 2014. ECF 263 (Valentine Decl.), ¶¶ 3, 5 & 6. Ms. Valentine was the House of Babes defendants' "employee" within the meaning of the FLSA and Section 34a, and the House of Babes defendants were Ms. Valentine's "employers" within the meaning of the same laws.

Ms. Hogan and Ms. Valentine, on behalf of themselves and all similarly situated dancers comprising the proposed plaintiff class and collective action membership in this case, have brought suit against all of the defendants. As plaintiffs and proposed class

representatives, Ms. Hogan and Ms. Valentine seek appropriate injunctive, equitable, and declaratory relief against all defendants and monetary relief against same under federal and state antitrust laws, Ohio's tort law of civil conspiracy, and federal and state wage laws. As plaintiffs and proposed class and collective action representatives, Ms. Hogan and Ms. Valentine seek monetary relief from all defendant clubs, club owners, and club managers under the FLSA, Section 34a, and R.C. § 4113.15.

C.    Defendants' Unlawful Pay Policies

It ought to go without saying that an employer cannot get away with paying an employee nothing, much less require the employee to pay the employer for the privilege of working. To avoid paying dancers any wages, Flaig, BACE, OC, and the club defendants take the position that the dancers at each defendant club are not "employees," but, instead, something else—here, tenants leasing space in which to dance. This is the essence of the Tenant System—a legal fiction that purports to absolve strip clubs adopting it from the legal obligation to pay dancers for their work and that actually forces them to pay the clubs for the privilege of working there.

The core claims brought by plaintiffs are straightforward: the defendant clubs do not pay their dancers to work and, instead, exact various fees from them disguised as, for example, "rent"; and the clubs have accomplished this via the Lease Agreement that Flaig conceived and has disseminated and the Tenant System that Flaig, BACE, and OC have co-promoted and conspired to disseminate and enforce. These artifices treat dancers as non-employee "tenants," denying them the full protections of FLSA, Section 34a, and Ohio's

Prompt Pay Act. Ohio law uses the FLSA definition of "employee." *See* Section 34a. Because dancers are employees under the FLSA, they also are "employees" for purposes of Ohio's minimum wage law. *See, e.g., Hart v. Rick's Cabert Intern., Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013). Like the FLSA, Section 34a also requires employers to pay employees a minimum wage.

Because Section 34a incorporates the FLSA definitions of "employer" and "employee," the results reached in cases like *Hart* and those it cites obtain here as well: dancers, whether labeled as "lessees," "tenants," or "renters," are employees entitled to minimum wage protections. *Id.* Moreover, Ohio's Prompt Pay Act generally requires employers to pay employees, at a minimum, every two weeks. R.C. § 4113.15(A). By adhering to the Tenant System and forcing dancers to sign the Lease Agreement or a variant of it, the defendant strip clubs deny dancers *any* wages, perforce violating Section 34a and Ohio's Prompt Pay Act. *See, e.g., Craig v. Bridges Bros. Trucking LLC*, 823 F. 3d 382, 385, n. 1 (6th Cir. 2016). There also can be no question that Flaig, BACE, and OC have conspired with their member or affiliated clubs to promote and enforce the clubs' adherence to the Tenant System and the Lease Agreement.

### 1. Use of the Tenant System in Ohio and elsewhere in the United States

Flaig devised the Tenant System, the template for the Lease Agreement, and form documents related to both beginning in about 2010. *See* Exhibit K to ECF 262-11, pp. 50-52, 65, 80 & 86. Using the same template for each club that adopts his Tenant System and uses his Lease Agreement, Flaig (sometimes through OC) simply places each club's name on the

uniform document. *See*, *e.g.*, ECF 107-4 (Lease Agreement used by Sirens); Exhibit A to ECF 262 ("Living Room" Lease Agreement, copyrighted by OC); Exhibit B to ECF 262 ("Top Hat" Lease Agreement, "Supplied by The Owners Coalition"); Exhibit C to ECF 262 & ECF 392, Page ID # 4662 through #4695 ("Private Dancer" Lease Agreement, "Supplied by The Owners Coalition"); ECF 371-2, Page ID # 3951 through # 3987 ("Cheeks" Lease Agreement); *id.* at Page ID # 4009 through # 4042 ("Fantasyland" Lease Agreement); *see also* ECF 386-1, Page ID # 4492 ("House of Babes Entertainer Application and Tenant Space Lease," signed by DeJha Valentine); Exhibit A hereto ("Centerfold" Lease Agreement); ECF 371-2, Exhibit U, Page ID # 4045 (House of Babes has required all of its dancers to sign the Flaig Lease Agreement since 2017 or 2018).

Supported, assisted, and encouraged by Flaig, OC, and BACE, the defendant clubs, club owners, and club managers, acting in concert with their trade associations and with one another, have fully implemented the Tenant System in the years since 2009.[1] Sirens' Rule

---

[1] Jay Nelson, director of operations at Sirens, testified as follows at his deposition (Exhibit D to ECF 262, pp. 103-104):

> A: If you're talking about how long strip clubs have charged rent—
> Q: Right.
> A: —they've done that for probably 40 years.
> Q: Okay. Just wasn't formally put into a lease-tenant agreement?
> A: Correct.
> Q: Okay. That, you think, is what started around 2009.
> A: That's correct.
> Q: Okay. Do you know who started that, how that idea came about?
> A: I believe Gregg Flaig.
> Q: He's the Owners Coalition?
> A: Correct.
> Q: Now BACE, right?

30(b)(6) deposition testimony confirmed an "industry agreement" whereby, according to Sirens, approximately 60% of Ohio's adult entertainment clubs use the same Lease Agreement, which purports to allow them to charge "rent" and other fees to their dancers and to avoid paying their dancers as employees, as required by the FLSA, the OMFWSA, and the Prompt Pay Act. *See* Exhibit D to ECF 262, pp. 102-04, 169.

In addition to embodying and instantiating the unlawful Tenant System, the Lease Agreement functions as a coercive device designed to convince dancers of two things (among others) that are not true—that they can give up their rights under the FLSA and that they will be punished if they attempt to assert those rights. The Lease Agreement includes these coercive provisions:

- "**THE PARTIES SPECIFICALLY DISAVOW ANY EMPLOYMENT RELATIONSHIP BETWEEN THEM**, and agree that this **Lease** shall not be interpreted as creating an employer/employee relationship." *See, e.g.*, ECF 107-4, p. 4 (emphasis in original) & ECF 371-2, Page ID # 3965 (emphasis in original).

- "If any court, tribunal, or governmental agency determines that the relationship between the parties is something other than that of Landlord/Tenant and that the Tenant is then entitled to the payment of monies from Property Owner, all of the following apply: * * * the Tenant shall surrender, reimburse, and pay to Property Owner, all Net Dance Performance Fees." *Id.* at 5. ECF 107-4, p. 5 & ECF 371-2, Page ID # 3966.

Under the Tenant System, dancers also are forced to sign the statement, "Should I ever wish to challenge the Entertainer Tenant agreement, I recognize that the club will ask for my yearly

---

A: Correct.
Q: Because those two have merged?
A: Yes, that is my understanding.

tax filing to determine what I have made while leasing space and if necessary, share that with the proper authorities so that both parties may understand your financial / lease questions." Exhibit 7 to ECF 386-1, Page ID # 4500.

The Lease Agreement is not merely a contract that the defendant clubs have required their dancers to sign. It encapsulates the rules and regulations that have dictated their pay practices vis-à-vis their dancers, pay practices these clubs have abided by. *See* Exhibit B hereto, Excerpt from Flaig's 3/6/2020 Rule 30(b)(6) Deposition for Centerfold, pp. 15-16 ("Q. I just want to make sure we are clear that Centerfold abides by all of the obligations that are contained in [the Lease Agreement] and adheres to them, correct? A. Yes."); Exhibit C hereto, Excerpt from Flaig's 3/6/2020 Rule 30(b)(6) Deposition for Top Hat, p. 55 ("Top Hat agrees to adhere to the lease."); Exhibit D hereto, Excerpt from James Deascentis Deposition, p. 55 (House of Babes now uses Flaig's Lease Agreement); Exhibit E hereto, Excerpt from Elbert Lee Hale Deposition, p. 78 (Cheeks abides by the Flaig Lease Agreement that it requires its dancers to sign); Exhibit F, Excerpt from Mark Potts Deposition, p. 42 (Fantasyland West abides by the Flaig Lease Agreement).

The unlawful pay arrangement to which plaintiffs and the dancers they seek to represent have been subjected as a result of defendants' unlawful actions and conspiracy is not unique to the Ohio strip club industry. Courts throughout the country have held, "nearly without exception," that dancers are employees, not independent contractors, striking down arrangements that treat them as independent contractors, *Hart v. Rick's Cabaret Intern., Inc.,*

967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013), including artifices such as the Lease Agreement, and affirming that exotic dancers are "employees" entitled to FLSA protections.[2]

### 2. The complicity of Flaig, OC, and BACE in the wage and antitrust violations

#### i. Active encouragement of and involvement in their members' wage violations

BACE and OC are industry organizations that under Flaig's leadership purport to advocate on behalf of Ohio strip clubs and their owners. They provide advice and training materials, and promulgate programs, practices, and policies such as the Tenant System and disseminate forms such as the Lease Agreement. The form Lease Agreement devised and disseminated by Flaig and OC and promoted by Flaig, OC, and BACE requires the dancer to pay "rent" and other fees to the club and provides that the club will not pay any wages to the dancer. There can be no reasonable dispute that the defendant clubs, club owners, and club

---

[2] *See, e.g., Reich v. Circle C. Invest., Inc.*, 998 F.2d 324, 329 (5th Cir.1993) ("We reject the defendants' creative argument that the dancers are mere tenants who rent stages, lights, dressing rooms, and music from Circle C."); *Harrell v. Diamond A Entm't, Inc.*, 992 F.Supp. 1343, 1348 (M.D. Fla. 1997) (dancers who signed "License to Use Business Premises" and were classified as independent contractors were actually employees under the FLSA); *Vaughn v. M-Entertainment Properties, LLC,* No. 1:14-cv-914, 2016 WL 7365201 (N.D. Ga. Mar. 15, 2016) (granting summary judgment and holding that dancers classified as "tenants" who signed an "Activity and Facility Use Agreement" with club were employees under the FLSA); *Kimbrel v. DEA Corporation*, No. 3:14-cv-161, 2016 WL 7799340 (E.D. Tenn. Aug. 2, 2016) (granting summary judgment to exotic dancers who were classified as "tenants" and signed leases to work at the club); *Mason v. Fantasy, LLC*, No. 13-cv-2020, 2015 WL 4512327 (D. Colo. July 27, 2015) (dancers classified as non-employee "tenants" were granted summary judgment on their FLSA misclassification claims); *McFeeley v. Jackson Street Entertainment, LLC*, 47 F.Supp.3d 260 (D. Md. Sept. 15, 2014), *affirmed* 825 F.3d 235 (4th Cir. 2016) (summary judgment granted to exotic dancers classified as independent contractors who signed "Space/Lease Rental Agreement of Business Space" to dance at adult entertainment club).

managers adhere to the same Tenant System and/or have used the same Lease Agreements with the full support and encouragement, and the active collaboration, of Ohio's two strip club industry groups, OC and BACE, as well as Flaig himself. This substantiates plaintiffs' civil conspiracy claim against Flaig, BACE, and OC. *See* Order of March 26, 2018, ECF 125, pp. 5 & 10, Page ID # 1199 & # 1204 ("The thrust of Plaintiffs' allegations are that BACE and OC *conspired* with their member clubs in carrying out the wage and hour violations, not that BACE and OC are 'employers' that can be liable themselves under the statutes…. Here, the underlying claims on which the civil conspiracy claims are based are the wage and hour violations, which Defendants do not argue did not occur.").

### ii. Active encouragement of and involvement in their members' antitrust violations

A trade association—even one that purports to be nonprofit, as BACE does—can be held liable under antitrust laws for anticompetitive actions taken by its representatives for the benefit and on behalf of its members. *See American Soc. of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982). Plaintiffs also seek to hold OC and BACE, as well as Flaig acting on behalf of them both, liable for antitrust violations, including price fixing and group boycott. Price fixing occurs when two competitors jointly set prices for their respective goods or services. *See Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 9 (1979). Impermissible price-fixing arrangements are not limited to agreements to charge uniform or identical prices. *See, e.g., United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (combination with the purpose and effect of raising, depressing, fixing, pegging or stabilizing

the price of a commodity in interstate or foreign commerce is illegal *per se*); *Local 36 of Intern. Fishermen & Allied Workers of Am. v. United States,* 177 F.2d 320, 337 (9th Cir.1949) (same); *In re Wheat Rail Freight Antitrust Litig.,* 579 F.Supp. 517, 538 (N.D.Ill.1984), *aff'd* 759 F.2d 1305 (7th Cir.1985) (held, agreement that sets manner of calculating rates and prices is illegal price fixing).

BACE, OC, and Flaig have played a central role in depressing dancers' earnings and increasing their member or affiliated clubs' take through anticompetitive conduct. They have long promoted and coerced use of the Tenant System and the Lease Agreement among their member clubs and affiliated clubs, *see* Exhibit F to ECF 262 (Living Room deposition excerpt), pp. 33-34, as a way to restrict dancers' ability to fight for higher earnings, including those due them under federal and state laws. For example:

- In a memorandum to "All owners" dated November 6, 2008 regarding "Union Activity," Flaig stated:

> It was brought to my attention by an owner a recent meeting from Cleveland that a number of entertainers are trying to unionize women in the clubs. Our "tenant lease" program will keep you in the clear and allow you to protect your business without the opportunity for successful legal action from them. If you are doing anything that allows the entertainers to be called "employees", you are setting yourself up for a very painful class action lawsuit, if the entertainers should choose to do so. As a Human Resource Professional for 12 years, an industry business owner and consultant for another 12 years, I can tell you as a fact that most suits of this nature are frivolous, but still costly. If we insure that there is no opening for a lawsuit of any type, you don't have to waste your money in court with attorneys or waste time making threats to entertainers trying to change their minds. Treat your tenants like tenants. If you don't know how, I will be willing to teach you.

Exhibit G to ECF 262.

- In a memorandum to "All Owners and General Managers" dated December 5, 2010 and January 5, 2011, Flaig stated, "We are finally done with revisions, copying, printing, distributing and implementing The System in Clubs throughout Ohio…. *You must get all your Entertainers on the Tenant Leases immediately, if you have not already*…." Exhibit H to ECF 262 (emphasis added).

- According to a memorandum from OC to "All Owners and Enforcement Agencies" dated June 25, 2014, Flaig said OC "exists … [t]o unite '"like-minded', law abiding clubs, club owners and operators for a common good," and to "share information regarding the laws pertaining to our business and general information in regards to our business." Exhibit I to ECF 262.

- Flaig continued in the same memorandum: "The Owners Coalition is a group of Adult Owners who have come together to insure that the above reasons to exist is monitored and maintained in a fair and consistent manner through our programs which are the tools we will place at every members disposal." *Id*. Among the "tools" Flaig listed in this memorandum was "The Tenant Lease System." *Id*. The memorandum listed 34 OC-member clubs. *Id*.

- While the Lease Agreements and related materials contain notations indicating they were created by Flaig and OC, BACE also has actively promoted their use by BACE-member clubs. In a memorandum, the president of BACE and the owner of Cheeks, defendant Hale, told "All owners and G.M.'s'": "If our Entertainers use the Entertainer Tenant system, it looks like entertainers will not be employees. This is a big win for us in our fight to keep entertainers from being classified as employees." Exhibit J to ECF 262.

- According to what Sirens admitted under oath is "an industry agreement," *see* Exhibit D to ECF 262, p. 169, the Lease Agreement has been and is being used by BACE members across Ohio to deny dancers their legally guaranteed wages by perpetuating the fiction that they are "tenants" of the clubs where they dance, rather than employees. Sirens GM Jay Nelson testified that strip clubs in Ohio made the "policy decision" to use the "lease agreement" to run their businesses. He also testified that Sirens, of which Nelson has been director of operations, has used the Lease Agreement without questioning it in order to go along with the rest of the Ohio strip club industry. *Id*. at 168-69. In other words, based on Mr. Nelson's testimony, there is active, ongoing collusion among BACE members, to use the same "Lease Agreement" to deprive dancers throughout Ohio of their rightful wages under state and federal law, and BACE, OC, Flaig, and their member clubs have chosen to participate in and abide by this industry-wide collusion. *Id*.

- Moreover, on behalf of BACE and OC, Flaig has conducted weekly audits of their member clubs in part to ensure their compliance with, *inter alia*, the Tenant System, *see* Exhibit K to ECF 262 (BACE/OC Deposition, Vol. I), pp. 30, 41, 50, 64 & 82, and has publicly defended the member clubs' use of it. *See* Exhibit L to ECF 262 (4/3/14 article, TNS Regional News).

- So tightly bound together are Flaig, BACE, OC, and these clubs that when plaintiffs' counsel issued party discovery and third-party subpoenas in this case to OC, BACE, Cheeks, Top Hat, Private Dancer, and Centerfold under Fed. R. Civ. P. 30(b)(6), *every one of them* designated Flaig as their representative and he so testified. By acting on behalf of these defendants before and/or during this litigation, Flaig has projected a unified front among them and has attempted to manage, control, and manipulate the flow of information to plaintiffs' counsel, which served to underscore his role as the hub of the conspiracy. Second Amended Complaint, ECF 271, p. 6, Page ID # 2766, ¶ 15.

At clubs utilizing it, the Lease Agreement imposes price and earnings restrictions on dancers in numerous ways. First, it confines them to a mythical "tenant" status, which the clubs maintain entitles dancers to no wages and precludes them from claiming employee status that otherwise would entitle them both to hourly wages under federal and state laws and to all of the benefits that flow from such status. *See* Exhibit M to ECF 262 (Tenant System package, Part 1), p. 1 (requiring any dancer choosing the "tipped employee" option to attest to the following: "By choosing this option I know I will not dance on stage or do private or champaign [*sic*] rooms when I am working."); *see also* Exhibit A to ECF 262, p. 94.

Second, the Lease Agreement confines dancers to its price and earnings restrictions by setting up an automatic renewal mechanism that effectively precludes dancers from escaping the Lease Agreement for an entire year. The Lease Agreement provides that it "shall automatically renew every day for a period of up to one (1) year …." Exhibit B to ECF 262, Part 2, p. 1. The only way a dancer who signs it could theoretically avoid automatic non-

renewal under the standard Lease Agreement is to give "notice to the other party of the intent not to renew at [*sic*] one (1) day prior to the expiration of the initial or any renewal term …." *Id.* This supposed right not to renew is illusory, however, in that it is predicated on the dancer having to give notice to the club "at [*sic*] one (1) day prior to" the lease's expiration. Because the "lease" does not expire and in fact "automatically" renews "every day" for an entire year, during that entire year there never comes a point that is one day prior to the lease's expiration. Thus, for an entire year, there is no practical way for the dancer to exercise her supposed right not to renew — and consequently no way for her to escape from its price and earnings restrictions for an entire year while dancing at that club.

Third, the standard Lease Agreement dictates the manner of setting prices in myriad ways that depress the prices that dancers can earn for their services. For example:

- The agreement states that the dancer must "pay rent" to the club "in an amount set for [*sic*] on the Lease Addendum (referred to as Lease Space Time Rent" and that the club owner "shall establish a fixed fee for the use of space for private, champagne and table dances[] performed on the Premises (referred to as 'Private Room Space Rent') …." Exhibit C to ECF 262, Part 2, p. 3.

- The Lease Agreement demands that "Dance Performance Fees" not be characterized as "tips" or "gratuities" but rather as "services charges to the customer for the purchase of a personal private room dance performances with the Entertainer Tenants." *Id.*

- The Lease Agreement permits a club owner "to require the Entertainer Tenant to share a portion of her tips with other tipped employees as assistance fee's [*sic*]." *Id.* at 5.

- The Lease Agreement provides that if any court or government agency "determines that the relationship between the parties is something other than that or Landlord / Entertainer Tenant and that the Entertainer Tenant is then entitled to the payment of money from" the club owner, "the Entertainer Tenant shall surrender, reimburse and pay to [the club owner], all Net Dance Performance Fees (which are defined as Dance

Performance Fees remaining after the payment of lease time rent, additional rent, and contract damages) earned by the Entertainer Tenant at any time while performing on the Premise ….” *Id.*

- The Lease Agreement requires that, if the dancer “fails to pay any applicable tax and [the club owner] is later held accountable by any court, tribunal, or government agency for the payment of taxes on income generated by the Entertainer Tenant while performing on the Premises,” the dancer must pay the club owner “a portion of Net Dance Performance Fees earned by the Entertainer Tenant equal to the amount of taxes, interest, and penalties that [the club owner] is required to pay.” *Id.* at 5-6.

Moreover, according to the Lease Agreement, a dancer even *claiming* that her relationship with the club is “other than that of a Landlord and the Entertainer Tenant” constitutes “a material breach” of the Lease Agreement, entitling the club owner to payment by the dancer “equal to all Net Dance Performance Fees earned by the Entertainer Tenant pursuant to this Lease ….” *Id.* at 6.

This is not the only respect in which Flaig, OC, and BACE and the defendant clubs coerce dancers to accede to “tenant” status and its price restrictions. They do so by means of a group boycott. The Tenant System requires clubs to inform dancers that only those who accept “tenant” status and eschew “employee” status will be allowed to dance at their clubs. Exhibit P to ECF 262, p. 2 (“When implementing this program, you must tell everyone they have a right to refuse applying as an Entertainer Tenant, but we do not have any Employees who are allowed to entertain.”); Exhibit A to ECF 262, p. 124. Flaig and OC use their power to spotlight and blacklist troublemakers, including a dancer who started “a stripper labor website” to organize other dancers against the Tenant System. Exhibit D to ECF 262, pp. 164-

165; *see also* Exhibit G to ECF 262 (anti-union organizing memo from Flaig to all owners, cited above).

###### iii. Efforts by BACE to conceal its member clubs' use of the Tenant System and the Lease Agreement

Not only have BACE and OC been instrumental in the development and implementation of the Tenant System in Ohio, BACE has been active in concealing facts about its member clubs' adherence to that system and their use of the Lease Agreement. BACE itself refused to identify its members in this case, claiming that the First Amendment protects it from being forced to divulge their identities. *See* ECF 196, 201, 202 & 206. This impeded plaintiffs' efforts to identify Ohio clubs using the Lease Agreement. An internal BACE memorandum obtained from one club via a subpoena shows that, when plaintiffs' counsel served subpoenas on Ohio clubs seeking information on the lease agreements they have used, BACE's counsel actively assisted the BACE-member clubs thus targeted in resisting such subpoenas. *See* Exhibit N to ECF 262, p. 1 ("In our second case, which comes from the Sirens case in Columbus, Ohio, we as BACEOHIO and Greg Flaig with the Owners Coalition have been fighting for over 1 year to keep the clubs from being included in the Sirens case. Our attorneys Luke Lirot, Tony Cicero and Bill Klausman have worked to keep the clubs from engaging. At a cost of over $20,000 so far, we have developed responses, motions to quash, interrogatories and research that have been very effective so far."). Despite the efforts of BACE's counsel, discovery has revealed that clubs belonging to or affiliated with OC and/or BACE have used a standard Flaig-designed Lease Agreement substantially equivalent to the

one used by Sirens. *See, e.g.*, Exhibit A to ECF 262 ("The Living Room"), Exhibit B to ECF 262 ("Top Hat"), Exhibit C to ECF 262 & ECF 392, Page ID # 4662 through #4695 ("Private Dancer"), ECF 371-2, Page ID # 3951 through # 3987 ("Cheeks"), *id.* at Page ID # 4009 through # 4042 ("Fantasyland"), Exhibit A hereto ("Centerfold") &  ECF 371-2, Exhibit U, Page ID # 4045 ("House of Babes").

Independent research of internet archives by plaintiffs' counsel also revealed that BACE has actively urged—indeed, coerced—its members to adhere to the Tenant System, under threat of ostracism. For example, in his memorandum to BACE members dated June 25, 2014, defendant Hale, BACE's president and the owner of defendant Cheeks, expressly promoted the Tenant System developed by Flaig, who, in addition to his association with OC, was listed as the BACE's "secretary" as long ago as August 12, 2013, and is now described as BACE's executive director. *See* ECF 206-1. Hale's memorandum states, "If our Entertainers use the Entertainer Tenant system, it looks like entertainers will not be employees. This is a big win for us in our fight to keep entertainers from being classified as employees." Exhibit J to ECF 262. Hale's memorandum unequivocally signaled that clubs choosing to remain outside BACE and OC and not to follow their lead would be ostracized and left to fail. *Id.* ("If your [*sic*] not PART OF BACE OR THE OWNERS COALITION, YOU NEED TO JOIN, AS SOON AS POSSIBLE, BACE WILL NO LONGER HELP CLUBS OR WORK WITH PEOPLE WHO DON'T GET IT!  I have asked Greg Flaig to STOP helping non-BACE and Coalition clubs so we can let those clubs go down and leave the legal ones with more entertainers and customers."). In his internal memorandum to BACE members dated

November 20, 2017, Hale, referring to plaintiffs and plaintiffs' counsel in this case, pronounced the Lease Agreement "the best tool we have to stop these people from trying to undermine our business model with women who are looking for retirement payments instead of admitting the great opportunity to earn that being an Entertainer gives them." Exhibit N to ECF 262, p. 2. Indeed, BACE mandates that, "to remain in" the organization, clubs must adhere to either the "Entertainer Tenant Lease Program" or "a form of agreement that allows the Entertainer to be an independent contractor as well as informing the Entertainer of her rights and obligations of being on premise." Exhibit O to ECF 262, p. 1 (2/25/18 memorandum from Flaig, BACE's and OC's executive director, to "All State Enforcement Agencies").

### 3. The uniform legal standards applicable to the club defendants

It is undisputed that the defendant clubs did not and do not pay their dancers any wages. The central dispute in this lawsuit, rather, is whether the dancers are "employees" entitled to the FLSA's and Ohio wage law's protections. On this question, the case law is clear. "Nearly '[w]ithout exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d at 912. This case is not the exception.

The Sixth Circuit uses the "economic realities" test to determine whether a worker is an employee. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015). Using this test, courts consider six factors: (1) the permanency of the parties' relationship; (2) the degree of skill required to rendering the services; (3) the worker's investment in equipment or materials

for the task; (4) the worker's opportunity for profit or loss, depending upon his skill; (5) whether the service rendered is an integral part of the employer's business; and (6) the degree of control the employer has over the work. *Id.* In the exotic dancer context, a number of the factors are generally applied in the same way, across the industry. Plaintiffs address each factor below.

*Permanency of the parties' relationship.* As a category of workers, "exotic dancers tend to be itinerant." *Lester v. Agment LLC*, No. 1:15-cv-886, 2016 WL 1588654, at *5 (N.D. Ohio Apr. 20, 2016). As a result, "many courts … have accorded this factor only modest weight." *Id.* In this instance, however, there is a unique aspect of the dancers' required arrangement with the defendant clubs that adds longevity to their relationships: as noted above, the Lease Agreement confines dancers to no wages and to its other price and earnings restrictions by setting up an automatic renewal mechanism, effectively precluding dancers from escaping the Lease Agreement and its restrictions for an entire year.

*Degree of skill required to rendering the services.* Here, "courts have consistently held that exotic dancers 'do not exhibit the skill or initiative indicative of persons in business for themselves.'" *Id., quoting Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 327 (5th Cir. 1993); *see also Gilbo v. Agment, LLC,* Case No. 20-3287, 831 Fed.Appx. 772, 776 (6th Cir. 2020). There is nothing to suggest that defendants' dancers are distinguishable from the dancers that courts have held to be employees in analogous situations.

*The worker's investment in equipment or materials for the task.* As the *Lester* court held, "[l]ike nearly every court that has addressed this issue, the Court finds that this factor

weighs in favor of plaintiffs because the evidence shows that defendants' investment in operating the Brass Pole is significantly greater than plaintiffs' investment in their positions as dancers at the club." *Lester*, 2016 WL 1588654 at *5; *see also Gilbo*, at 776-777. As with the two factors above, nothing in this case appears to distinguish it from other dancer cases with regard to this factor, which weighs in favor of defendants' dancers qualifying as employees.

 *Opportunity for profit or loss.* Like nearly every other factor in the Sixth Circuit's test, the very nature of a strip club supports finding that the dancers' opportunity for profit or loss weighs in favor of holding them to be employees. "As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns." *Lester*, 2016 WL 1588654 at *5, *quoting Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1352 (M.D. Fla 1997). This analysis, which applies equally to defendants' dancers, weighs in favor of classifying them as employees. *See Gilbo*, at 777 ("Ultimately, what a dancer earns is 'limited by the bounds of good service' and the nightclub itself 'takes the risks and reaps the returns,'" quoting *Thompson v. Linda and A. Inc.*, 779 F. Supp. 2d 139, 149 (D.D.C. 2011), which in turn quoted *Harrell*, 992 F. Supp. at 1352).

 *Whether the service rendered is an integral part of the employer's business.* It is indisputable that exotic dancers are an integral part of a strip club's business. "That dancers play such an integral role is highly indicative of their economic dependence" and, thus, their status as employees. *See Harrell, Inc.*, 992 F. Supp. at 1352 (M.D. Fla 1997). As the Sixth Circuit said of the club whose dancers it affirmed as "employees" in *Gilbo*, so too must it be said of

28

each defendant club in this case: it "could not function without the services of its dancers." *Gilbo*, at 777.

**The degree of control the employer has over the work.** Because of how strip clubs necessarily operate, the above factors cannot be realistically disputed. Most often, clubs contest the degree of the employer's control, hence the cases affirming their status as employees tend to focus on this factor. The strictures and uniformity of the Tenant System and the Lease Agreement attest to the defendant clubs' high level of control over their dancers' work. The control includes requiring dancers to participate in the club's specials, setting the prices for dances, requiring dancers to work certain shifts at certain times (or be subject to fines), and requiring dancers to use particular stage names. When it comes to hiring, the clubs are hardly neutral lessors of space. The Application at the front of the standard Flaig Lease Agreement demonstrates how aggressively and uniformly adherent clubs screen their dancers to weed out those who will not stick to the script that they are "entertainer tenants," not employees. *See* ECF 392 at Page ID # 4662 through # 4671. Moreover, as with dancers at Sirens, plaintiffs allege that Cheeks, Top Hat, Private Dancer, Centerfold, House of Babes, and Fantasyland West have exerted substantial control over their dancers, including by:

- controlling and setting the rates that dancers charged customers,

- controlling and setting the fees that dancers paid to the club when dancing at the club,

- mandating that dancers conform to a certain look, including having make-up, nails, and hair done, subject to the approval of club managers,

- requiring that dancers work entire shifts at a time and, if the dancer did not, imposing fees or "fines" on the dancer,

- providing dancers with orientation and training regarding club rules and operations,

- explaining the dancers' role and rules regarding clubs' "drink hustle,"

- hiring, firing, and disciplining dancers,

- instructing about and requiring participation in "uptime" dance specials, and

- requiring dancers to tip out various club employees.

Indeed, the Lease Agreement itself establishes a level of control that courts routinely find to be sufficient to find strip clubs are "employers" and dancers "employees." For example:

- The Lease Agreement requires dancers to schedule their dance shifts a week in advance. *See, e.g.,* Exhibit I to ECF 392, ¶ 3, Page ID # 4673.

- The Lease Agreement requires dancers to give the club at least a day's notice if they cannot make a shift. *Id.*

- The Lease Agreement requires dancers to perform "artistic and fantasy dance entertainment" in the "leased space" for a "fixed fee" that the club has the right to set. *Id.* at ¶ 5(A).

- Under the Lease Agreement, the club "is permitted to require the Entertainer Tenant to share a portion of her tips with other tipped employees as assistance fee's [*sic*]." *Id.* at ¶ 7(B), Page ID # 4675.

- The Lease Agreement allows the club "in its sole and absolute discretion" to impose "conditions" on the dancers to "ensure that… basic internal systems are followed to insure maximum return on lease investment by Tenant." *Id.* at ¶ 6. In other words, the club can impose whatever rules it wants to properly run the entire operation. Of course, any employer can do this—if they treat their workers as the employees that they are.

- The Lease Agreement allows the club to terminate a dancer for "disruptive" behavior or violating any "public health or safety rules or concerns." *Id.* at ¶ 11.

- The Lease Agreement allows the club to terminate a dancer for claiming that she is an employee. *Id.*

- The Lease Agreement requires dancers to agree in advance that she will be sexually harassed, that she "will not be offended by" it, and that she "assumes any and all risks associated with being subject to" it. *Id.* at ¶ 15.

- Part 11 of the Lease Agreement package contains a litany of "conditions of space usage" that amount to traditional work rules. *See id.* at Page ID # 4687. The rules encompass everything from when a dancer must arrive for work and when they can leave, including that dancers "must participate in all lease space stage shows" and must have a manager's permission to leave the premises. *Id.*

To be clear, there is nothing wrong with employers imposing workplace rules, and the vast majority of the rules and regulations found in the standard Lease Agreement — with notable exceptions such as essentially requiring dancers to submit to be sexually harassed while working — are fairly normal: show up on time, do not leave early, follow the club's pricing structure, participate in the club's dance specials, etc. The issue is that when an employer exerts this level of control, the worker is an employee for wage and hour purposes and must be treated as such. *See, e.g., Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 148 (D.D.C. 2011) (citing nearly identical rules and, after viewing the evidence in the light most favorable to the defendants, holding that the club "exercised a significant degree of control over the plaintiffs' work").

What's extraordinary about clubs adhering to the Tenant System is not only the high degree of control they exert over dancers but the fact that Flaig, as architect of the Tenant System, demands that these clubs exert such control over dancers uniformly and aggressively as an essential tenet of the system. As an example, Flaig demands that adherents to the Tenant

System and the dancers who work under it must use specific verbiage to enable clubs to fend off claims that their dancers are employees. *See* ECF 392, Page ID # 4614 & 4616. As another example, the Tenant System comes with an "Entertainer Tenant Manual," at the front of which is an "Introduction to the Entertainer Tenant Manual" that includes a section entitled "Installing the 'Tenant Lease' System." Exhibit 5 to ECF 386-1 (De Marco Decl.). This section states, "The system has been developed to insure that the Entertainer Tenants remain non-employees and that enforcement agencies will have to work extremely hard to prove that an Entertainer Tenant was working on behalf of the club." *Id*. at 2. Then comes this pregnant sentence: "Further, you will be compartmentalizing the Tenant to keep any negatives coming back on your club when it comes to any court action." *Id*. The manual preaches secrecy both as to the manual itself ("Sections 1 & 2 of the 'Entertainer Tenant' manual should never be shown to anyone but your attorney and management personnel.") and as to the "Entertainer Tenant Agreement" that dancers are required to sign ("If a Tenant wants to take it home, she can't."). *Id*. at 2, 3. It is difficult to imagine a clearer example of control of dancers by the defendant clubs than Flaig's edicts that they "compartmentalize" their dancers and conceal the documents by which they do so from the outside world.

Given that most of the "economic realities" test factors are immutable in the strip club context and that, in order to properly function, clubs must control their dancers, "[n]early '[w]ithout exception'" courts find that dancers are employees under the FLSA and analogous state laws. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d at 912. The evidence will show that,

like nearly every other strip club, the defendant clubs employ their dancers, despite their protestations to the contrary.

The foregoing analysis not only previews the result of applying the "economic realities" test in this case but also the ease of applying it uniformly to all clubs adhering to the Tenant System, given their use of the same standard pay practices and form documents. Indeed, the whole point of the Tenant System, as emphasized repeatedly by BACE, OC, and Flaig, is that for it to function as intended, clubs must not deviate from the rules, the regulations, and the rigid terminology and strictures that Flaig designed into it – all of which makes this case uniquely well suited for collective and class action certification.

## II. LEGAL ARGUMENT

Plaintiffs ask that the Court conditionally certify an FLSA collective and certify a Rule 23 class consisting of the following workers:

> All non-owner, non-employer exotic dancers who worked at any of defendants' strip clubs at any time from May 14, 2014 to the present
>
> (1) while such club
>
>> (a) has used the Tenant System created and disseminated by Defendant Greg Flaig,
>>
>> *or*
>>
>> (b) has required its dancers to sign and abide by the Lease Agreement created and disseminated by Defendant Greg Flaig,
>>
>> *or*

(c) has otherwise formally regarded its dancers as leasing space as entertainers at such club and required them to acknowledge the same,

*and*

(2) while such club did not pay any wages to its dancers.

As noted at the outset, the Court approved the Settlement with the Sirens defendants in May 2021. That Settlement is in the process of being implemented. The proposed class definition set forth above is not intended to affect any dancer's rights under the Settlement with the Sirens defendants. It should be noted that dancers such as Ms. Valentine, who danced at both Sirens and another defendant club (in Ms. Valentine's case, House of Babes), and those who danced only at Sirens would equally be part of this proposed class because they worked under the Tenant System while at Sirens and should be allowed to recover against the non-Sirens defendants' for violations related to Sirens' and other clubs' use of the Tenant System and the Lease Agreement as alleged in the Second Amended Complaint (*e.g.*, civil conspiracy to violate wage and antitrust laws). In other words, Flaig, BACE, OC, and the other remaining defendants may still be held liable in this suit for the harm their actions and conspiracy caused to non-Sirens and Sirens dancers alike, notwithstanding the fact that dancers' claims against the Sirens defendants have been settled and extinguished. For this specific purpose, therefore, Sirens and non-Sirens dancers would be equally part of the proposed class.

Both the FLSA and Section 34a allow workers to bring an action on behalf of similarly situated workers. *See* 29 U.S.C. 216(b) ("An action to recover [unpaid wages and damages]

34

may be maintained against any employer… by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."); Section 34a ("An action for equitable and monetary relief may be brought against an employer by … an employee or person acting on behalf of an employee or all similarly situated employees in any court of competent jurisdiction … for any violation of this section …."). While suits under the FLSA and Section 34a must be brought within three years of the alleged violation, because a six-year statute of limitations applies to plaintiffs' equitable claim for unjust enrichment under Ohio law, *Radon Service Agreement Corp. v. Radon Service Agreement, Inc.*, No. 3-:04-CV-370, 2005 WL 2086010, *2 (S.D. Ohio, Aug. 26, 2005), the proposed class definition is predicated on the longest possible limitations period. This longer class period also is prudent given that equitable tolling comes into play due to defendants' misleading of dancers over a period of many years, *see Whitworth v. French Quarters Partners, LLC*, No. 6:13-CV-6003, 2013 WL 12364197 (W.D. Ark., July 31, 2013) and discussion of equitable tolling *infra,* and the fact that BACE and OC, whose role in propagating the Tenant System has been significant, were added as defendants on May 19, 2017 (ECF 74), three years before the Second Amended Complaint. In any event, although it is an open question whether Section 34a's "similarly situated" standard incorporates all of Rule 23's requirements, this case satisfies both the "similarly situated" standard (for FLSA and Section 34a purposes) and Rule 23's requirements.

A. **The "Similarly Situated" Standard Is Satisfied, Warranting Conditional Certification.**

Although courts often are asked to determine whether employees are "similarly situated" for FLSA purposes, neither the FLSA itself nor the Sixth Circuit has explicitly defined the term. *See Castillo v. Morales, Inc.*, 302 F.R.D. 480, 483 (S.D. Ohio 2014). At the conditional-certification stage prior to notice, plaintiffs must make only a "modest factual showing" that they are similarly situated to proposed class members. *See DeAngelis v. National Entertainment Group, LLC*, No. 2:17-cv-924, 2019 WL 6715974, *2 (S.D. Ohio, Dec. 10, 2019); *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759, 764 (N.D. Ohio 2015) (quoting *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006)). The standard at the first step is "fairly lenient ... and typically results in 'conditional certification' of a representative class." *Comer*, 454 F.3d at 547 (internal citations omitted). Courts generally consider factors such as employment settings, individual defenses, and the fairness and procedural impact of certification. *DeAngelis*, at *4; *Frye*, 495 F. App'x at 672 (citing *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009)). Plaintiffs are similarly situated "when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien*, 575 F.3d at 585. To be clear, showing a "unified policy" of violations, though sufficient, is not required. *Id*. at 584. The plaintiff "need only show that [her] position is similar, not identical, to the positions held by the putative class members." *Lewis v. Huntington Nat'l Bank*, 789 F. Supp. 2d 863, 867-68 (S.D. Ohio 2011); *see also Comer*, 454 F.3d at 546-547. At the conditional-

certification stage prior to notice, a court also "does not generally consider the merits of the claims, resolve factual disputes, or evaluate credibility." *Waggoner*, 110 F. Supp. 3d at 765 (citing *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 214 (S.D. Ohio 2011)). If conditional certification is granted, "plaintiffs are permitted to solicit opt-in notices, under court supervision, from current and former employees." *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *1 (S.D. Ohio, Nov. 2, 2015).

Plaintiffs have identified the Tenant System as an unlawful pay scheme that was devised and propagated by Flaig as a uniform, standard practice for Ohio strip clubs, that was promoted by Flaig, OC, and BACE, that is common to every defendant club named in this case, and that applies to every dancer at each of those clubs — a pay practice to which plaintiffs themselves also were personally subject. Courts routinely have found this type of widespread misclassification to be appropriate for FLSA conditional certification. *See, e.g.*, *Hart v. Rick's Caberet Int'l Inc.*, 2010 WL 5297221, at *7 (certifying a class of exotic dancers: "As other courts have previously found, the propriety of the defendants' blanket categorization of the plaintiffs as independent contractors, and if improper, the legal consequences of that categorization, by their nature, tend to predominate over any individual issues."). The court in *Woods v. Club Cabaret, Inc.*, 140 F.Supp.3d 775, 781 (C.D. Ill. 2015), catalogued conditional-certification determinations made by district courts in 27 FLSA cases involving misclassification claims brought on behalf of exotic dancers. Of the 27 FLSA decisions cited in *Woods*, only two declined to conditionally certify a class. *Id.*; *see also Ruffin v. Entertainment of the Eastern Panhandle*, No. 3:11–CV–19, 2012 WL 761659, *5 (N.D. W.Va., Mar. 7, 2012) (where

strip clubs admitted they paid their dancers no wages in any of their West Virginia clubs because they considered them independent contractors, the court conditionally certified a class of dancers at any of defendants' West Virginia clubs); *Jones v. JGC Dallas LLC*, No. 3:11-cv-2743, 2012 WL 6928101 (N.D. Tex., Nov. 29, 2012) (conditional certification granted for class of dancers who signed "Temporary Space Lease Agreement").

The FLSA claims in this case fit the pattern established in these other "exotic dancer" cases and likewise should be conditionally certified. It is undisputed that seven strip clubs – Cheeks in the Dayton area, Sirens, Private Dancer, Centerfold, and House of Babes in Columbus, Top Hat in Mansfield, Ohio, and Fantasyland West in Bucyrus, Ohio – have all used the uniform Tenant System devised and disseminated by Flaig and promoted by BACE and OC and that all seven clubs have either required their dancers to sign Flaig's standard Lease Agreement or have otherwise formally regarded dancers as leasing space from the club as entertainers and required them to acknowledge the same in writing. It also is undisputed that, as a consequence, these clubs have not paid any wages to their dancers. Nor can there be any reasonable dispute that, by pretending their dancers are non-employee lessees who "rent" space in order to perform at the club, all of the defendant clubs, club owners, and club managers have adhered to a formal uniform system that exacts unlawful payments from dancers for the privilege of dancing at their clubs. As alleged in the Second Amended Complaint, plaintiffs themselves have danced at Ohio clubs employing the Tenant System and the Lease Agreement devised by Flaig (Sirens and House of Babes). Due to the pervasive scheme involving all of the defendants, however, each of the plaintiffs and the class of

38

dancers they seek to represent have been subjected, and will continue to be subjected as members of the dancer community, to the same unlawful pay practices and policies. Plaintiffs thus are similarly situated to their fellow dancers and, accordingly, conditional certification is appropriate under the FLSA.

Before turning to Rule 23's factors and addressing class certification, plaintiffs must first discuss an unfortunate, ongoing reality of this lawsuit, one that mirrors the initial stage that focused on Sirens. As this Court is aware, Sirens destroyed Lease Agreements for any dancers who had not danced at the club for a month or so and destroyed the bubble and penthouse sheets daily. *See* ECF 165, Opinion and Order, Page ID # 1390 – # 1391. The Court imposed sanctions on Sirens because they destroyed documents during this lawsuit's pendency. *Id.* at Page ID # 1395. The Court noted that Sirens' destruction of leases and bubble/penthouse sheets was "pursuant to a pattern and practice — albeit a very poor one." *Id.* at Page ID # 1297. Sirens' destruction occurred both before and after the lawsuit was filed. The Court addressed Sirens' spoliation that occurred *after* plaintiffs filed this lawsuit. *See generally, id.* The FLSA requires employers to maintain records for each employee, including wages, hours, "and other conditions and practices of employment." 29 U.S.C. § 211(c). Section 34a has similar requirements and permits relief for such recordkeeping violations. *Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 1010 WL 1817284, at *4 (S.D. Ohio Apr. 30, 2010). This alone warrants class certification because all of the affected dancers would be entitled to the same type of relief for the same reason. An employer's failure to maintain wage and hour records

should not prejudice an employee. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946).

**B.    This Case Also Satisfies Rule 23's Requirements For Class Certification.**

The requirements to certify a class are set forth in Rule 23 of the Federal Rules of Civil Procedure. The plaintiff bears the burden of demonstrating that the case meets the Rule 23 requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In this regard, the plaintiff must show that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If the case satisfies these prerequisites, then the class action can be maintained under Rule 23(b)(3) if common questions of fact or law predominate over individual questions, and the class mechanism is superior to other methods of adjudication. Should the Court find that this case meets Rule 23(b)(3)'s requirements, then the Court must direct appropriate notice to the class. Rule 23(c)(2). From there, a class member can exclude herself from the case, if she so chooses. Moreover, where, as here, a substantial portion of the relief requested is injunctive, a class may be certified for that portion of the relief under Rule 23(b)(2) where the parties opposing the class have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(1)(A) often is satisfied in the same situations where Rule 23(b)(2) is satisfied, as is the case here.

1.  **The requirements of Rule 23(a) are satisfied.**

*Numerosity.* Numerosity is satisfied when joinder is "difficult or inconvenient." *Swigart*, 288 F.R.D. at 183. "When a class numbers in the hundreds or thousands, the impracticability of joinder is obvious." *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 288 (S.D. Ohio 2006). Even smaller classes have been found to be appropriate. *Id.* (citing *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)); *see also id.* (quoting *Appolini v. United States*, 218 F.R.D. 556, 561 (W.D. Mich. 2003)) (stating "a class of 40 or more members is sufficient to establish numerosity"); *Matthews v. Buel, Inc.*, No. 7:11-162-TMC, 2012 U.S. Dist. LEXIS 69461, at *5 (D.S.C. May 18, 2012) ("A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical.").

As explained in plaintiffs' pending Motion to Compel, the defendant clubs have resisted surrendering unredacted copies of their signed Lease Agreements, and there are indications that large numbers of these agreements have been discarded despite the pendency of this action and plaintiffs' specific requests for them in discovery. Nonetheless, it is possible to discern from defendants' deposition testimony that the number of dancers in the proposed class who have been subjected to Flaig's Tenant System or who otherwise have been formally regarded by defendants as leasing space as entertainers at the defendant clubs is more than sufficient to satisfy numerosity. For example, defendant Erick Cochran, the manager of the largest of the defendant clubs, Cheeks, testified that his club has had "250 to 300" dancers in a typical year, ECF 371-2, Exhibit S, Page ID # 3990, while House of Babes' owner James Deascentis testified that his club has had "20 to 25" dancers per year since 2017

or 2018, which amounts to more than 100 for that relatively small club alone during this time period. *See* ECF 371-2, Exhibit U, Page ID # 4045. There is no question of numerosity.

*Commonality.* Rule 23(a)(2)'s commonality requirement is satisfied where there are "questions of law or fact common to the class." Commonality exists "as long as the members of the class have allegedly been affected by" the same "general policy of the defendant, and the general policy is the focus of the litigation." *Sweet v. Gen. Tire & Rubber Co.*, 74 F.R.D. 333, 335 (N.D. Ohio 1976). Individual class members need not be identically situated to meet the commonality requirement. Rather, the "requirement is met where the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated." *Swigart*, 288 F.R.D. at 183, *citing DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). Moreover, commonality is not required on every question raised in a class action. Rather, Rule 23 is satisfied when the legal question linking the class members is substantially related to the litigation's resolution. *Id.*; *see also Bacon v. Honda of American Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (commonality not required when "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue").

In this case, the legal theories and relevant facts supporting them are common to the class because the class consists of workers who were treated and harmed in the same way by the same pay practices dictated by a common system under which they worked. This case addresses a discrete situation similarly affecting an entire group of people—precisely the situation for which Rule 23 is built.

Based on defendants' alleged conduct, plaintiffs also raise a number of causes of action beyond those arising under the FLSA. First, plaintiffs allege that defendants' failure to pay dancers any wages violates Ohio's Prompt Pay Act, R.C. § 4113.15. The Prompt Pay Act requires employers to pay their employees when the wages are due, and the failure to do so gives rise to a claim for the unpaid wages and, under certain circumstances, additional damages. Second, plaintiffs allege that defendants' failure to pay dancers any wages perforce violates Section 34a as well. Third, plaintiffs allege that defendants' refusal to pay minimum wages was a willful violation of the FLSA, which is a criminal act under 29 U.S.C. § 216(a), for which plaintiffs may seek damages under Ohio's statute allowing recovery of civil damages for criminal acts. *See* R.C. § 2307.60. Fourth, plaintiffs allege that defendants' failure to pay wages has unjustly enriched defendants. Unjust enrichment, unlike the claim for unpaid wages, focuses instead on the benefits defendants received from their failure to pay. Such damages will not be limited to unpaid wages, but, instead, the profits derived from the dancers' uncompensated labor. Fifth, plaintiffs allege that defendants' adherence to the Tenant System imposed unlawful price and earning restrictions on dancers in violation of federal and state antitrust laws. Sixth, plaintiffs allege that defendants are liable under Ohio tort law for civil conspiracy to commit wage and hour and antitrust violations.

These claims and the legal theories underpinning them arise from the same set of facts, affecting the same group of workers. Plaintiffs posit that all members of the proposed class have been misclassified by defendants as non-employee "entertainer tenants" pursuant to a common scheme devised by Flaig, promoted by Flaig, OC, and BACE, and adhered to by

each of the club defendants. These legal questions are thus common among all class members. This is sufficient to satisfy the commonality requirement.

*Typicality.* Rule 23(a)(3) requires that the class representatives' claims be typical of the class members' claims. "Typical does not mean identical, and the typicality requirement is liberally construed." *Swigart*, 288 F.R.D. at 185, *citing Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D.Ill.1996). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id.*, *citing Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir.1996); *Bass v. PJComn Acquisition Corp.*, No. 09-cv-01614, 2011 WL 2149602, at *3 (D. Col., June 1, 2011). The requirement of typicality focuses on the conduct of a defendant and whether a proposed class representative has been injured by the same kind of conduct alleged against the defendant as other members of the proposed class. *Id.*, *citing Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 491 (S.D.Ill.1999) ("The Court should concentrate on the defendants' alleged conduct and the plaintiffs' legal theory to satisfy Rule 23(a)(3)."). This is why a finding that commonality exists generally results in a finding that typicality also exists. *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 214 (S.D. Ohio 2003). Typicality "is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Swigart*, 288 F.R.D. at 185 (internal citations omitted). Where, as here, "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact

patterns which underlie individual claims." *Laichev v. JBM, Inc.,* 269 F.R.D. 633, 640-41 (S.D. Ohio 2008).

Here, plaintiff DeJha Valentine signed and was subjected to the same Flaig-devised Lease Agreement and to the same Flaig-devised Tenant System as were other members of the proposed class. This satisfies the typicality requirement. While plaintiff Jessica Hogan did not actually sign a Flaig-devised Lease Agreement, ECF 194-3 (Hogan Decl.), ¶ 15, and dancing was not her primary function at Sirens, *id.* at ¶ 11, the Sirens Lease Agreement was nevertheless raised as a defense against her. Even aside from that, Ms. Hogan's claims are typical of the other class members in that she danced on multiple occasions and, when she did, she was treated exactly the same as dancers covered by the Lease Agreement, *i.e.*, she was not paid any wages and the club (Sirens) exacted a "rent" charge from her—precisely as Flaig conceived the Tenant System. *See id.* at ¶¶ 14-15.  While Ms. Hogan's damages will differ in amount from those of other, full-time dancers, her legal claims against these defendants, including for injunctive relief, are nonetheless typical. Differences in the amounts of damages allegedly owed to each putative class member are "not fatal to a finding of typicality." *Laichev,* 269 F.R.D. at 641. Typicality is satisfied.

*Adequacy.* Rule 23(a)(4) requires that class representatives must fairly and adequately protect the interests of the class. This requirement calls for a two-pronged inquiry: (1) Do the representatives have common interests with the unnamed members of the proposed class? (2) Will the representatives vigorously prosecute the interests of the class through qualified

counsel? *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). These two requirements are satisfied here.

With respect to the first inquiry, because plaintiffs are challenging the same unlawful conduct and seeking the same type of relief as would the rest of the class members, plaintiffs' interests are aligned with those of the class members sufficient to satisfy the first prong of the adequacy requirement. *See, e.g., Swigart*, 288 F.R.D. at 186; *Smith v. Babcock*, 19 F.3d 257, n.13 (6th Cir. 1994); *Thomas v. SmithKline*, 201 F.R.D. 386, 396 (E.D. Pa. 2001). Moreover, because plaintiffs seek to certify a Rule 23 class for relief based in part on Section 34a, the language of this constitutional provision should inform the Court's "adequacy" analysis under Rule 23(a)(4). As noted above, Section 34a provides, "An action for equitable and monetary relief may be brought against an employer by … an employee or person acting on behalf of an employee or all similarly situated employees in any court of competent jurisdiction … for any violation of this section …." Thus, this language from Section 34a deems it proper for "an employee or ***person acting on behalf of*** an employee or ***all similarly situated employees***" to bring an "action for equitable or monetary relief … for any violation of this section …." Section 34a (emphasis added). Given that this constitutional provision specifically empowers "a person acting on behalf of … all similarly situated employees" to bring an action and that plaintiffs are persons acting on behalf of all employees who, like them, have been subjected to the Tenant System and the Lease Agreement, this should make them not merely proper plaintiffs for Section 34a purposes but also adequate class representatives for Rule 23(a)(4) purposes.

46

With respect to the second inquiry, the proposed class representatives are ready, willing, and able to fulfill their duties and have done so to date. Ms. Hogan has prosecuted this case since 2015. She even turned down an under-the-table settlement offer that Sirens improperly conveyed outside of the normal attorney channels. ECF 194-3 (Hogan Decl.), ¶ 16. This shows rare courage and dedication to her role in prosecuting this lawsuit on behalf of other dancers. Ms. Valentine likewise has persisted with her role as class representative despite being blacklisted by House of Babes for bringing this suit. Exhibit D at 57-59 (Testimony by House of Babes owner James Deascentis: "A. … I was there when [DeJha Valentine] tried to come back to work there…. Q. When? A. About a year ago. Q. In 2021? A. Yeah…. And she asked me, she says, "Why can't I come back to work there?" … Okay? I said, "No, you can't come back." … She said, "Why don't you let me come back?" I said, "No." You -- you know, I didn't say about the lawsuit or anything like that. "No. You know better than that. I can't do that." Q. But that's the reason why you didn't want her to come back, the lawsuit? A. Well, yeah. I didn't want to, you know, to get sued again from her… Q. Okay. So if she hadn't filed a lawsuit, you would be receptive to her coming back? A. Sure. Yeah.").

Moreover, plaintiffs' counsel remain well qualified to handle this matter. They already have actively and vigorously pursued plaintiffs' and the putative class members' claims against Sirens in this case, and have committed, and will continue to commit, substantial time and resources as needed to represent the putative class against the remaining defendants in this case.

Thus, this case satisfies all of the requirements of Rule 23(a).

2.    **The requirements of Rule 23(b) are satisfied.**

We turn next to the requirements of Rule 23(b), starting with those in Rule 23(b)(3), followed by Rule 23(b)(2) and Rule 23(b)(1)(A).

*Predominance under Rule 23(b)(3).* The predominance requirement evaluates whether a proposed class is cohesive enough to merit adjudication by representation. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Predominance is established where "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306, F.3d 1247, 1252 (2d Cir. 2002).

As described above, there are numerous common questions of law and fact arising out of defendants' conduct that can be resolved on a classwide basis. Most notably, liability turns on whether, under the strictures of the Tenant System and Lease Agreement devised by Flaig and adopted by the defendant clubs, the Court concludes that defendants' dancers are "employees" and, thus, entitled to minimum wage protections. Because these issues would be determined principally based on common proof, plaintiffs submit that common questions predominate in this case. *See, e.g., Swigart*, 288 F.R.D. at 186. As a result, this case is appropriate for class certification. As noted in *Hart*, the legal consequences of an employer's "blanket categorization" of workers "tend to predominate over any individual issues." *Hart*, 2010 WL 5297221 at *7.

*Superiority under Rule 23(b)(3).* The superiority question under Rule 23(b)(3) requires the Court to consider whether a class action is superior to other methods of adjudication. Rule 23(b)(3) lists four factors to be considered: (1) the interests of class members in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in management of the class action.

Here, there is no evidence that putative class members have any interest in maintaining this litigation in separate actions. Indeed, the relative size of the individual claims in this case makes class resolution perhaps the only way these workers can recover their allegedly unpaid wages in an economical way. *See, e.g., Tedrow v. Cowles*, No. 2:06-cv-637, 2007 WL 2688276, *8 (S.D. Ohio 2007) ("As Plaintiffs convincingly argue, the majority of putative class members would not likely have their day in court on these claims if a class is not certified because of a lack of sophistication, lack of resources, lack of representation and similar barriers."). Moreover, efficiency militates in favor of concentrating the claims in this Court, as there is no record of other, similar litigation pending in Ohio. A final resolution of defendants' liability in this case also is fair because the case deals with pay policies affecting large numbers of employees. It avoids competing decisions on these issues and offers finality. There is no device that can resolve these matters as efficiently and fairly as a class action. Finally, no major difficulty is likely to arise in management of the class action as the putative class is a defined size. Class certification here promotes consistent results, giving defendants

"the benefit of finality and repose." *Id*. (internal citations omitted). Adjudicating this matter as a class action is the most efficient and the fairest manner of resolving these claims. Moreover, should the Court deem it appropriate to create subclasses for dancers at individual defendant clubs, such a device is only available through the class action procedure, specifically Rule 23(c)(5).

*Partial certification under Rule 23(b)(2)*. As noted above, where, as in this case, a substantial portion of the relief requested and justified is injunctive in nature, a class may be certified for that portion of the relief under Rule 23(b)(2). Rule 23(b)(2) is properly invoked where the parties opposing the class have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

For reasons peculiar to this case, this case is particularly suited to broad injunctive relief, especially given that the injuries resulting from defendants' repeated and continuing violations of Section 34a and the Prompt Pay Act may not be fully compensable with monetary damages, or at least the nature and circumstances of the injuries inflicted may make damages difficult to calculate for one particular reason. *See Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). As plaintiffs already demonstrated in this case with respect to Sirens, so too can it be said of these defendant clubs and others that adhere to the Tenant System and the Lease Agreement: treating dancers as non-employees and not paying them any wages leads to non-existent record-keeping, causing great difficulty in calculating damages reliably for individual dancers. Given that, at the instigation of Flaig,

50

BACE, and OC, clubs such as these for years have treated dancers as non-employees, it should not be surprising that records needed to fashion precise or even adequate monetary relief are difficult to come by, if not completely unavailable. The very misclassification that plaintiffs attack here promotes a mode of doing business among its adherents—*e.g.*, failure to maintain records for purposes of payroll, unemployment insurance, or workers compensation—that naturally would make complete monetary recovery by all affected dancers elusive. The same reasons make calculating monetary relief for defendants' price fixing violations problematic as well.

In this case, the conduct of defendants toward their dancers makes appropriate a broad order enjoining them from doing, attempting to do, or conspiring to do the following:

- Using the Tenant System or the Lease Agreement conceived by Flaig and OC and promoted by Flaig, OC, and BACE, or any variant thereof under which dancers are classified as lessees, tenants, licensees, or anything other than employees;

- Disseminating to Ohio strip clubs, club owners, club managers, or their agents or employees, or promoting or encouraging their use of, the Tenant System, the Lease Agreement, or any variant thereof under which dancers are classified as lessees, tenants, licensees, or anything other than employees;

- Colluding with one another or with other Ohio clubs, their owners, managers, agents or employees to classify dancers as lessees, tenants, licensees, or anything other than employees or to deprive dancers of their rightful wages under the FLSA and equivalent state-law protections; and

- "Blacklisting," retaliating against, or attempting to intimidate or harass, or advocating that others "blacklist," retaliate against, or intimidate or harass any dancer for joining or becoming involved in this case or for otherwise asserting her right to fair wages and/or free competition in the marketplace.

Accordingly, it would be proper for the Court to certify the injunctive relief portion of this case under Rule 23(b)(2). The fact that injunctive relief is sought in addition to monetary relief does not defeat class certification under Rule 23(b)(2). *See* 5 *Moore's Federal Practice* (3 Ed.1997), pp. 23-196 to 23-197, Section 23.43[3][a]. A perfectly appropriate solution, rather, is to certify the injunctive portion under Rule 23(b)(2) and the rest under either Rule 23(b)(3) or Rule 23(b)(1). *See* 7A Wright, Miller & Kane, *Federal Practice and Procedure* (2d Ed. 1986), § 1775, p. 470.

      ***Certification under Rule 23(b)(1)(A).*** Rule 23(b)(1)(A) permits certification of a class if there is a risk that separate adjudications will result in "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Rule 23(b)(1)(A) directs a court "to consider whether individual actions would have an adverse effect on the party opposing the class." 7A Wright, Miller & Kane, *Federal Practice and Procedure* (2d Ed. 1986), § 1773, p. 427. Specifically, "Rule 23(b)(1)(A) is designed to protect against the nonclass party's being placed in a stalemated or conflicted position and is applicable only to actions in which there is not only a risk of inconsistent adjudications but also where the nonclass party could be sued for different and incompatible affirmative relief." *Employers Ins. of Wausau v. Federal Deposit Ins. Corp.*, 112 F.R.D. 52, 54–55 (E.D. Tenn. 1986); *see also* Wright, Miller & Kane, § 1773 at 429–31.

      In addition to Rules 23(b)(3) and Rule 23(b)(2) as discussed above, Rule 23(b)(1)(A) equally applies to this case. The fact that the defendant clubs have used common instruments that circumscribe their pay practices with their dancers—specifically the Lease Agreement

52

and the Tenant System manual—both of which were devised by the same person, Greg Flaig,
raises the specter of inconsistent adjudications that could set incompatible standards of
conduct for the defendants. As such, certification of this case under Rule 23(b)(1)(A) also
would be appropriate.

### C.        Plaintiffs' Proposed Notice and Notice Procedure Should Be Approved.

The FLSA vests district courts with "discretion to implement 29 U.S.C. § 216(b) … by
facilitating notice to potential plaintiffs." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170,
110 S. Ct. 482 (1989). Notice should be "orderly, sensible, and not otherwise contrary to
statutory commands." *Id*. The Supreme Court intentionally left significant discretion to
oversee notice in the district courts' hands: "We confirm the existence of the trial court's
discretion, *not the details of its exercise*." *Id*. (emphasis added).

Similarly, Rule 23(c)(2) instructs the Court to "direct to class members the best notice
that is practicable under the circumstances, including individual notice to all members who
can be identified through reasonable effort." As under the FLSA, Rule 23 gives the Court
discretion to craft a notice process that is appropriate under the peculiar circumstances of
each case.

For those dancers for which defendants have maintained contact information,
plaintiffs ask the Court to authorize the proposed notice attached as Exhibit G to such dancers
through regular U.S. Mail and email. "Electronic mail is an inexpensive, non-invasive,
effective way to ensure that notice is received in a timely manner." *Brandenburg v. Cousin
Vinny's Pizza, LLC*, No. 3:16-cv-516, 2017 WL 3500411, at *5 (S.D. Ohio, Aug. 15, 2017).

Plaintiffs' proposed email will contain a link to the notice.[3] The email version of the notice allows employees to join the case electronically. In addition, plaintiffs request that the notice be posted at the location of each defendant club. *See, e.g., Brandenburg*, 2017 WL 3500411 at *6 ("posting the notice at Cousin Vinny's locations is a low-cost, non-invasive way to ensure that timely and accurate notice of the lawsuit is conveyed to putative collective members")

Plaintiffs further request that the Court direct the defendant clubs to produce a computer-readable list of all their dancers' actual names, last-known addresses, last-known email addresses, and dates of employment since May 14, 2014 within fifteen (15) days of the order authorizing the notice requested herein.

Unfortunately, the above notice will cover an unknown a fraction of eligible dancers. Like Sirens, several of the more recently added defendant clubs, despite plaintiffs' counsel sending litigation-hold letters and discovery requests to them, are likely to have discarded all or substantial numbers of their dancers' Lease Agreements, which are the best source of dancers' actual names and contact information and, thus, the only reasonable means to contact many dancers. For those class members, it appears necessary to find more options for issuing notice. These include the use of text messages, website postings, and publication

---

[3] The email would state, "You may be eligible to join a lawsuit for unpaid wages against Cheeks, Centerfold, Private Dancer, Top Hat, House of Babes, and/or Fantasyland West plus other defendants affiliated with them. Please go to *www.xxxxxxxx.com* to review the Court-authorized Notice about this lawsuit. After reviewing the Notice, you may join the lawsuit by electronically signing the Notice. If we have a current mailing address on file, you should also receive a copy of the Notice by regular mail. You may also join the lawsuit by mailing back the consent form with the Notice. If you have any questions, you may contact Biller & Kimble, LLC at XXX-XXX-XXXX or Markovits, Stock & DeMarco, LLC at XXX-XXX-XXXX."

notices. For the standard methods of notice—direct mail and email—plaintiffs will bear the costs as usual (subject to reimbursement under the FLSA and Ohio law if the case is successful). For the additional forms of notice—text, website, and publication—plaintiffs ask that defendants be required to pay the costs of those forms of notice upfront, since defendants' unlawful recordkeeping policies necessitate these additional types of notice. As a matter of equity, defendants should not be able to force plaintiffs to incur extra expense only to, at the end of it all, cry poverty and the inability to pay. If defendants are unable to pay for the notice their actions require, it is best everyone—plaintiffs and the Court—find out at this stage.

Plaintiffs further request that the Court's order specifically bar defendants or anyone acting on their behalf from retaliating against any dancer who chooses to opt into or otherwise participate in this action and that the order permit the filing of opt-in forms obtained by plaintiffs' counsel under seal. This is necessary due to the evidence already uncovered by plaintiffs showing that retaliation and retribution against dancers who attempt to assert their lawful rights has been standard practice under Flaig's Tenant System. *See* ECF 386 at Page ID # 4468 - # 4469; *see also* Exhibit D hereto (DeJha Valentine blacklisted by House of Babes for bringing this suit).

This case has another, unfortunate aspect that makes it unusual compared to normal FLSA cases for notice purposes. The Flaig-devised Lease Agreement was designed to mislead dancers and frighten them into not asserting their wage and hour rights. It intentionally misrepresents the facts regarding the dancers' rights and what it would mean for them to be

classified as employees by a court. This situation requires a special notice to ensure dancers understand the lease they signed cannot waive their employee rights nor would a judicial finding that they were misclassified as a non-employee harm them, as the Lease Agreement claims. For example, the Lease Agreement implies that being a "tenant" will grant dancers additional "privacy" protections that employee-status would not grant. *See* ECF 392 (Lease Application documents), at Page ID # 4671. It implies that it will grant protection to the dancer if another dancer "do[es] something illegal" in a way from which an employee would not otherwise be protected. *Id.* at Page ID # 4671, ¶ 3. It claims that it "insures [*sic*] that you will not be labeled an employee, as you are not." *Id.* at ¶ 6. It impermissibly requires dancers to "disavow any employment relationship" with their club. *Id.* at Page ID # 4674 (Lease Agreement), ¶ 7(A). It misleadingly suggests that, if the dancer were classified as an employee, the dancer would get no more than tipped minimum wage plus tips. *Id.* at ¶ 7(B). It also tells the dancer that, if a court holds that she is an employee, then she must pay back to the club "all Net Dance Performance Fees." *Id.* at Page ID # 4675, ¶ 7(C). In other words, if any dancer asserts her FLSA rights, the club claims it can seek financial retribution. This is contrary to the law. *See Wagoner v. N.Y.N.Y., Inc.*, No. 1:14-cv-480, 2015 WL 1468526, at *6 (S.D. Ohio, Mar. 30, 2015) (holding that a club cannot recover dance fees as a "counterclaim" in an FLSA action: "The breach of contract claim is focused entirely on the recovery of dance fees as a result of bringing this lawsuit, which is a creative attempt to circumvent the protections of the FLSA and OMFWSA."). It states that the club is allowed to seek an award of attorneys' fees if a dancer unsuccessfully sues the club, *id.* at Page ID # 4678, ¶ 18(B), which

is contrary to both the FLSA's anti-retaliation provision and Section 34a's provision barring fee awards from being levied against employees, absent a finding that the action was frivolous. Potentially the most egregious fraud is a list of fabricated claims about what it means to be an "employee" versus an "entertainer tenant," at the end of which the dancer must sign off on the list. *Id.* at Page ID # 4666 - #4668; *see also id.* at Page ID # 4670. Its only purpose is deception.

In a typical wage and hour case, the employees are on closer to neutral footing. They may have heard generally from their employer that the employer paid the workers correctly, but rarely much more. Here, defendants have taken great pains to misrepresent to dancers what it means to be an employee, to detail in misleading terms what would happen if a court deemed them to be employees, and to suggest that defendants are allowed to retaliate against dancers who try to assert their rights. To remedy what amounts to egregious fraud, the notice must specifically address these issues. Plaintiffs' proposed notice (Exhibit G hereto) attempts to do so with additional language aimed at informing class members about their rights.

We turn finally to the issue of the length of the opt-in period. Typically, a 90-day opt-in period is appropriate. *See, e.g., Brittmon v. Upreach*, LLC, 285 F. Supp. 3d 1033, 1045 (S.D. Ohio 2018) ("Courts in this district have frequently used their discretion to grant ninety-day opt-in periods."). Here, however, as noted above and in plaintiffs' pending Motion to Compel, defendants have destroyed or discarded the best contact information (the completed Lease Agreements) for large swaths of the class. As a result, additional time should be given so that class members can have a chance to hear about the lawsuit through the above forms

of notice and, inevitably, through normal word-of-mouth. Plaintiffs suggest that 180 days is appropriate in light of the circumstances of this case. This will create the highest probability that all putative members will learn about the lawsuit and give consideration to whether they want to join. Those who do not join in time will be free to file their own suits, so efficiency is served by allowing as much time as possible to join the case. Furthermore, in addition to a longer than normal opt-in period, plaintiffs also submit that the Court's order should include a provision tolling the statute of limitations for the dancers' FLSA claims. As detailed in plaintiffs' pending Motion to Compel, defendants have withheld documents and information that plaintiffs properly requested on November 1, 2021. During this time, dancers have continued to suffer under the unlawful Tenant System and Lease Agreement while club owners have continued to walk away with the fruits of the dancers' labors. This should not be tolerated, particularly in light of the decision issued by the Sixth Circuit in *Gilbo*, 831 Fed.Appx. 772, in which the court of appeals noted that "[m]any courts" that have examined "whether exotic dancers are employees of the clubs where they work have answered yes," *id.* at 776, and stated it had "no trouble" holding that dancers at an Ohio strip club, the Brass Pole, are employees under FLSA and Ohio wage law. *Id.* at 778. *Gilbo* and the cases cited in it and above strongly suggest that the die is cast on the future of the Tenant System in Ohio, no matter how far off defendants attempt to push the day of reckoning through their withholding or destruction of documents. To avoid rewarding defendants for this willful conduct, equity requires that the statutes of limitations on dancers' FLSA claims be deemed tolled as of the original due date of the requested documents, December 1, 2021. There will

be other tolling issues in this case based on misleading representations by defendants, but those are for later consideration with the merits. *See Whitworth v. French Quarters Partners, LLC*, 2013 WL 12364197.

## III.    Conclusion

For the foregoing reasons, plaintiffs respectfully request that the Court (1) conditionally certify this case as a collective action using the proposed definition, (2) certify it as a Rule 23 class action using the same definition, (3) approve plaintiffs' proposed notice and method of disseminating notice, (4) order defendants to provide name and contact information for all potential class members within 15 days of the Court's order, (5) authorize plaintiffs to send the notices via regular U.S. mail and e-mail, (6) require defendants to post the notice in a conspicuous place at each of their club locations, (7) authorize the additional forms of notice at defendants' cost, and (8) authorize a 180 day opt-in/out period with tolling as of December 1, 2021.

<div style="margin-left: 40%">

Respectfully submitted,

/s/ Paul M. De Marco
Paul M. De Marco (0041153)
MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Fifth Floor
Cincinnati, Ohio 45202
Tel.: (513) 651-3700
pdemarco@msdlegal.com

Andrew R. Biller (0081452)
BILLER & KIMBLE, LLC
4200 Regent Street, Suite 200
Columbus, OH 43219
Tel.: (614) 604-8759

</div>

abiller@billerkimble.com

*Attorneys for Plaintiffs*


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed on September 26, 2022 through the Court's ECF system, which will send a copy to all parties. A copy of the foregoing was also sent by regular mail to the defaulting Centerfold defendants at the same service address used throughout this litigation.


/s/ Paul M. De Marco
Paul M. De Marco (0041153)